MARVA HAYES WOOD AND ROBERT COLLIN WOOD, SR., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wood v. Commissioner
Docket Nos. 21483-84, 11979-85, 11980-85
United States Tax Court
T.C. Memo 1991-205; 1991 Tax Ct. Memo LEXIS 229; 61 T.C.M. (CCH) 2571; T.C.M. (RIA) 91205; May 14, 1991, Filed *229 Decisions will be entered under Rule 155. James T. Burnes, David Weinfeld, and Charles Cowley, for the petitioners. Miles D. Friedman, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent in his notices of deficiency determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Petitioners Marva Hayes Wood and Robert Collin Wood, Sr.
Year
Deficiency 1980
$ 6,458  1981
6,652
1982
6,496
Petitioners Thomas C. and Janice G. Walker
Year
Deficiency
1980
$ 4,414  1981
7,305
1982
9,461
[2] Additions to Tax or Interest, Secs.  Year
6651(a)(1)
6653(a)
6653(a)(1)
6653(a)(2)
6659
6661
6621(c)
1980
$ 221
$ 221
-- -- -- -- **
1981
-- -- $ 365
* *230 $ 2,192
-- **
1982
-- -- 473  *
2,838  $ 946
**
Petitioners Robert E. and Frances C. Stephenson
Additions to Tax or Interest, Secs.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659 6621(c)
1981
$ 11,969
$ 598 * $ 3,591
** In his amended answer, respondent asserted additions to tax and increased interest under sections 6653(a)(1) and (2), 6659, and 6621(c) against petitioners Marva Hayes Wood and Robert Collin Wood, Sr., for 1981 and 1982. Also by amendment to answer, respondent asserted an addition to tax under section 6661 against the Woods for 1982. The primary issues for decision are: (1) Whether petitioners' purchases of solar water-heating equipment were sham *231 transactions, lacking in economic substance and profit objective; (2) whether promissory notes executed by petitioners with respect to the solar water-heating equipment are too contingent to be included in petitioners' cost basis with respect to the equipment; (3) whether the solar water-heating equipment qualifies as section 38 property with respect to which investment credits are allowable; (4) whether the solar water-heating equipment allegedly purchased by petitioners was placed in service in 1981 and 1982; (5) whether the leases in question satisfy the noncorporate lessor rules of section 46(e)(3); and (6) whether the additions to tax and increased interest determined and asserted by respondent should be sustained. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time of filing their respective petitions herein, petitioners Marva Hayes Wood and Robert Collin Wood, Sr., resided in Orem, Utah, petitioners Thomas C. and Janice G. Walker resided in Clearfield, Utah, and petitioners Robert E. and Frances C. Stephenson resided in Salt Lake City, Utah. In 1981 and 1982, the Woods, the Walkers, and the Stephensons entered into separate and individual *232 transactions for the stated purpose of purchasing [3] solar water-heating equipment. The initial transactions did not involve partnerships. After the purchase of the solar water-heating equipment by petitioners, the equipment was to be leased by leasing companies on petitioners' behalf to various end users such as owners of single and multi-family residences and owners of commercial buildings. For a fee, the leasing companies were to be responsible for finding and contracting with end users for the lease of petitioners' solar water-heating equipment and for the installation, maintenance, repair, and re-lease of the equipment, all on petitioners' behalf. Under leases to be entered into with end users of the equipment, end-user lease payments with respect to the equipment were to be based either on fixed monthly rates to be negotiated by the leasing companies and the end users, or on negotiated percentages of the dollar savings each month in the end users' gas and electric heating bills attributable to the use of the solar water-heating equipment. *233 Petitioner Robert Collin Wood, Sr. (Wood), is a professor and has a background in aeronautical engineering. Petitioner Thomas C. Walker (Walker) is an electrical engineer. Petitioner Robert E. Stephenson (Stephenson) is a professor of engineering. In late 1980, Wood became concerned about his family's future financial situation. A colleague who was a financial planner recommended the solar water-heating equipment leasing program offered by Southwest Solar Products, Inc. (Southwest Solar), as an investment program that offered a hedge against inflation, an investment in an environmentally clean industry, and a type of investment that during the early 1980's was being promoted heavily by State and Federal Governments through various tax and other incentives. In December of 1981, the Woods traveled to Oceanside, California, where they inspected equipment involved in the solar water-heating equipment leasing program offered by Southwest Solar. Prior to 1981, Walker had become particularly interested in solar water heating systems. Walker and Stephenson were clients of a financial planner who, for reasons similar to those given to Wood, recommended the solar water-heating equipment *234 investment and leasing program offered by Southwest Solar. Southwest Solar is a California corporation. Its president and sole shareholder was Paul Mills (Mills). Other key individuals involved in developing and promoting the solar water-heating equipment investment program of Southwest Solar during 1980 through 1983 were Roger Bergerson (Bergerson), a stockbroker, and Randolph Shipley (Shipley), an attorney. Shipley arranged to have Financial Planning Consultants, Inc. (FPCI), an investment counseling firm, market the investment program of Southwest Solar to other financial planners and to individual investors. Shipley also incorporated Lessors Management & Data Services, Inc. (LMDS), to act for 15 years as the primary leasing or management company with respect to the end-user leases of the solar water-heating equipment, and to be responsible for finding end users, for negotiating end-user leases, for installing the equipment on property of end users, and for maintaining the equipment. Lawrence Nielsen (Nielsen) was hired to manage LMDS from 1981 to April of 1985. At some point in time, Nielsen purchased the stock of LMDS from Shipley. LMDS would contract with other leasing *235 companies to assist in locating end users, and it would contract with various building contractors for installation of the equipment on the residential and commercial property of the end users. LMDS prepared quarterly reports and mailed to investors in the Southwest Solar program annual reports describing the extent of the leasing activities of the equipment and of the end-user lease proceeds received. As suggested, the management agreement with LMDS was to have a 15-year term, but after the first 2 years, the management agreement could be terminated by the investors or by LMDS without cause upon a 60-day notice. As compensation for its services in finding end users, in negotiating end-user leases of the equipment, and in installing the equipment on property of end users, LMDS was to receive from each investor a "location fee" of $ 1,400 with respect to each four pieces or components of equipment leased to end users on the investors' behalf. Half of the $ 1,400 location fee (or $ 700) was to be paid in cash by the investors at the time they invested in the Southwest Solar program, and the $ 700 balance of the location fee was to be paid out of lease payments received on the investors' *236 behalf from end users under the end-user leases. If LMDS terminated the management agreement within the first 2 years of the agreement, LMDS would forfeit its right to the deferred $ 700 portion of the location fee. It is not clear from the record if the cash portion of the location fees that was paid by petitioners was refundable if no end users for the equipment were found, or if the investors' particular equipment was not installed under end-user leases. No interest accrued on that $ 700 deferred portion of the location fee. As compensation for its services in maintaining the equipment and in collecting end-user lease payments, LMDS was to receive from each investor a management fee in the amount of 7 percent of actual lease payments received each year from end users under the end-user leases. The investors also entered into agreements with other leasing companies labeled 12-month leases under which the other leasing companies were to be involved in finding end users and in installing and maintaining the equipment. As compensation for their services, the other leasing companies were to receive an additional fee of 3 percent of actual lease payments received each year from *237 end users under the end-user leases. If the equipment became available for release, LMDS, on behalf of the investors, was to attempt to release the equipment to additional end users. With the exception of the water tanks, the solar water-heating equipment to be purchased by investors under the Southwest Solar investment program was to be manufactured by Grumman Energy Systems Company, Inc. (Grumman). Southwest Solar would purchase the Grumman solar water-heating equipment from various distributors of Grumman equipment such as Southwest Solar Distributors, Inc. (SSD), a California corporation that was an established distributor of Grumman equipment and that was owned and managed by Richard Mangiarelli, a friend of Mills. The water tanks included in each package of solar water-heating equipment available under the Southwest Solar program were manufactured by various manufacturers and were purchased by Southwest Solar from various distributors and manufacturers. SSD and other distributors of Grumman solar water-heating equipment would purchase the equipment in large quantities and would obtain quantity discounts from Grumman on the purchase price of the equipment. The schedule *238 below reflects generally, for each year, the listed dealer prices and the retail prices for the basic components of a typical solar water-heating equipment package involved in the Southwest Solar program. 1981
Dealer Price Retail Price 321-A Collector
$ 326
$ 424
332-A Collector
$ 485
$ 631
OL-100 Controller
$ 282
$ 367
CF-100 Controller
$ 630
$ 819
66 Gal. Water Tank
$ 223
$ 290
1982
Dealer Price Retail Price 321-A Collector
$ 326
$ 424
332-A Collector
$ 485
$ 631
OL-100 Controller
$ 282
$ 367
CF-100 Controller
$ 630
$ 819
66 Gal. Water Tank
$ 223
$ 290
1983
Dealer Price Retail Price 321-A Collector
$ 326
$ 424
332-A Collector
$ 462
$ 600
OL-100 Controller
$ 321
$ 417
CF-100 Controller
$ 702
$ 912
66 Gal. Water Tank
$ 261
$ 339
The above prices include only the cost of purchasing the equipment. They do not include shipping, installation, or maintenance costs relating to the equipment. Under the investment program offered by Southwest Solar, individual investors (including petitioners herein) agreed to pay a total amount for the solar water-heating equipment and for the contract rights they *239 received in connection therewith that was significantly higher than the quantity discounted prices, the wholesale prices, and the retail prices for which the equipment alone could be purchased directly from Grumman. A significant cash downpayment of approximately 30 percent of the total stated purchase price was made by each investor, and a 15-year promissory note for the balance due at 9-percent interest was executed by each investor. The investors' promissory notes were secured by the equipment and were stated to be recourse notes. However, unless the investors defaulted with regard to some other feature of the notes during the 15-year term of the promissory notes, all payments of principal and interest on the promissory notes would be made only to the extent of an agreed percentage (in most cases 60 percent) of lease proceeds received each year from end users under the end-user leases. Only at the end of the 15-year term of the promissory notes did the investors have any stated personal liability on the notes. During 1980 through 1983, Southwest Solar sold approximately 56,000 "units" or "packages" of Grumman solar energy equipment to individual investors. The investors were *240 located primarily in California and in other western States. In 1981 and 1982, petitioners herein purchased "A," "B," and "D" units from Southwest Solar. In an "A" unit, the solar water-heating equipment generally included four components: Two Grumman model 332-A solar collectors, one Grumman model CF-100 or model OL-100 control module, and either a 120-gallon, an 82-gallon, or a 66-gallon water storage tank. In a "B" unit, the solar water-heating equipment generally included eight components: Four Grumman model 321-A solar collectors, two Grumman model OL-100 control modules, and two 66-gallon water storage tanks. In a "D" unit, the solar water-heating equipment generally included only four Grumman model 321-A solar collectors. No control modules or storage tanks were included. Whenever a "D" unit was purchased, the investors' equipment was to be installed at the property of an end user in combination with equipment of other investors (e.g., with control modules and water storage tanks purchased by other investors). In some instances, Grumman would provide SSD with assigned serial numbers for equipment which had not yet been manufactured. SSD in turn would furnish the preassigned *241 equipment serial numbers to Southwest Solar, and the numbers would then be assigned to equipment sold to investors in the Southwest Solar program even though the equipment was not yet manufactured. Individual investors at the time they made their investments in the Southwest Solar program were not aware that some of the equipment they were to purchase had not yet been manufactured, and the documentation given to investors (except as noted below) reflected specific serial numbers for the equipment. The above solar water-heating equipment offered by Southwest Solar could easily be installed on new or on existing buildings. Only minor structural modifications were required for installation. Bolts were run through the roof and piping was run through the exterior wall. The solar collectors were mounted on the roof on racks which were bolted through the roof to the roof joists or beams. The Grumman 321-A collector has a dry weight of 79 pounds. The Grumman 332-A collector has a dry weight of 126 pounds. Both collectors have a depth of less than 3 inches. The Grumman OL-100 control module may be hung on a wall or in a closet. A typical system consisting of two collector panels, *242 a control module, and a water storage tank, could be installed by two experienced installers on a residential property in approximately 8 hours. Nuts and bolts and other miscellaneous materials relating to the installation of the Southwest Solar water-heating equipment generally were to be provided by the leasing companies handling the installation of the equipment without any further specific charge therefor to the investors or to the end users. Once installed, the primary maintenance required on a typical residential solar water heating system is to the water storage tanks. The tanks should be drained generally once a year to remove accumulated sediment. The protective cathodes installed on the tanks to prevent corrosion should be replaced at least every 5 years. Every 7 years, the system's pump should be inspected, and the system's pressure relief valves and sensors tested. Other than the pump and the water moving through the system, the system has no moving parts. Assuming proper maintenance, the solar water heating systems and their basic components at issue in this case have a useful life of approximately 20 years. Even without proper maintenance, many Grumman OL-100 *243 and CF-100 control modules have a useful life of 15 years. The removal of a typical residential solar water heating system is fairly straightforward. The process would involve cutting and removing connection pipes, disconnecting wires from the power source, removing conduit and wiring, disconnecting and removing the pump and control module, reconnecting the cold water supply to the conventional water heater, disconnecting the roof mounts, removing the collectors, and patching the roof and wall. A typical two-panel system installed on a single-family residence would be removable in 6 hours by a crew of two. A contractor's typical charge for removal of a system would be $ 550. Following removal, the basic solar components (collectors, control modules, and water tanks) could typically be reused on other buildings. During the various months indicated in 1981 and 1982, the various petitioners in this case purchased "A," "B," and "D" units of Grumman solar water-heating equipment from Southwest Solar. They also made cash down payments, executed promissory notes, and paid location and franchise fees, as indicated below: Total No. and  Equipment Cash Promissory
Type Units
Purchase Price
Paid Note
Woods Dec. 1981
1 "B" unit
$ 12,000
$ 4,100
$ 7,900 Dec. 1982
2 "D" units
$ 12,300
$ 4,400
$ 7,900 Walkers
June 1981
2 "A" units
$ 17,560
$ 6,000
$ 11,560
Nov. 1982
4 "D" units
$ 24,600
$ 8,000
$ 15,800
Stephensons
June 1981
2 "A" units
$ 17,560
$ 6,000
$ 11,560
Dec. 1981
1 "B" unit
$ 12,000
$ 4,100
$ 7,900 Dec. 1982
3 "D" units
$ 18,450
$ 6,600
$ 11,850
*244 Cash Paid on Franchise
Location Fee Fee
Woods
Dec. 1981
$ 1,400
-- Dec. 1982
$ 1,400
$ 100
Walkers
June 1981
$ 1,400
-- Nov. 1982
$ 2,800
$ 100
Stephensons
June 1981
$ 1,400
-- Dec. 1981
$ 1,400
-- Dec. 1982
$ 2,100
$ 100
Petitioners executed written purchase agreements, security agreements, management agreements with LMDS, and lease procurement and installation agreements with regard to their equipment. Petitioners in 1982 executed agreements and promissory notes substantially similar in all material respects to the agreements and promissory notes they executed in connection with the 1981 transactions. The nominal franchise fee paid by investors in 1982 was for a brochure explaining various aspects of equipment leasing. Petitioners' investments in the solar water-heating equipment under the Southwest Solar program were made in part on the basis of projections of proceeds to be received from end users under anticipated end-user leases of the equipment, and on the basis of various Federal and State tax benefits available generally to purchasers and lessees of solar water-heating equipment. The projections of end-user lease proceeds and the *245 explanations of the tax benefits and government incentives in connection with the purchase of solar water-heating equipment were reflected in the Southwest Solar investment prospectuses given to petitioners and to other prospective investors. Also included in the investment prospectuses were copies of news articles reflecting generally industry and government predictions of the future prices of oil. As mentioned, on the dates petitioners entered into their 1981 and 1982 transactions with Southwest Solar, some of the Grumman solar water-heating equipment sold to them was not yet manufactured. The records of Grumman indicate that the manufacture and shipment of some of the equipment to Southwest Solar did not occur until the following year. These records include Grumman's factory production logs, shipping memoranda, freight invoices, and bills of lading. Also, Southwest Solar had not acquired all of the water tanks at the time it purportedly sold the units or packages of equipment to investors. In a number of instances, Southwest Solar and the leasing and installation companies apparently purchased water tanks only when needed to complete actual installations of the equipment *246 on the property of end users. LMDS's sales invoices given to investors did not always indicate serial numbers for the water tanks purchased. Solar Energy Leasing Company, Inc. (SELCO), and Stellar Leasing, Inc. (Stellar), were two leasing companies LMDS utilized during 1981 and 1982 to find end users and to install the solar water-heating equipment. Many investors (through LMDS as their agent) entered into lease procurement and installation agreements with either of these two companies. SELCO did not actually install solar systems. Rather, it would subcontract with other leasing companies or contractors to install the equipment. Out of the cash portion of the location fees paid to LMDS by investors, LMDS paid the leasing companies or the salesmen of the leasing companies a cash commission of a few hundred dollars with respect to each standard package or unit of solar water-heating equipment leased to end users on behalf of the Southwest Solar investors. In addition to the sales commissions, LMDS was to pay the leasing companies the costs of installing the solar water-heating equipment on the property of end users. In most cases, the $ 700 per unit cash portion of the location *247 fees was not sufficient to cover the leasing companies' costs of installing the solar water-heating equipment under the Southwest Solar program. Additional problems associated with the Southwest Solar program resulted from improper installation of some of the equipment by inexperienced contractors. Some of the salesmen of the leasing companies, in inducing end users to enter into leases, misrepresented to end users the nature of the leases. Some end users apparently understood that they were purchasing the solar water-heating equipment, or that they would have an option to purchase the equipment for a nominal price at the end of the lease term. Contributing further to the leasing and installation problems was the misuse by some of the individuals involved in the Southwest Solar program of some of the cash received from investors. Also, some of the installation companies submitted bills for installations of equipment that were not complete or that were improper. Recordkeeping was poor, and end-user lease documentation was inadequate. As a result of the various problems, there was an increasing backlog of uninstalled equipment that had been sold to investors in the Southwest *248 Solar program. As of May of 1983, it was estimated that only 6,069 out of the 21,532 basic solar components sold to investors in 1980 and 1981 had been installed on property of end users, and only limited funds remained to pay for further installations. Due to the problems, a dispute developed among the key individuals involved in the Southwest Solar program as to how to proceed. A lawsuit was filed by and against the various individuals. As a result of a settlement of a portion of the lawsuit, Shipley relinquished control of the remaining funds to be used for installing the equipment, and he terminated his involvement in the Southwest Solar program. The promissory notes received from investors relating to the purchase of the equipment were distributed to and divided among Shipley, Mills, and Bergerson. Despite the changes that were made, the leasing and installation problems continued and were never solved. Arrangements were made by Shipley, Mills, and Bergerson to sell the investors' promissory notes to a New Mexico savings and loan association for approximately 20 percent of the face amount of the notes. The savings and loan, however, was placed into receivership by State *249 and Federal authorities, and the disposition of the proceeds realized on the sale of some of the notes is not clear from the record. Some of the investors apparently repurchased their promissory notes. With regard specifically to the particular solar water-heating equipment sold to petitioners in this case under the Southwest Solar program, some of the equipment was leased and installed on the property of end users. The solar collector panels the Woods purchased in December of 1981 were leased in November of 1983 to the owner of an apartment building in Albuquerque, New Mexico. Under the modified end-user lease agreement, the end user was to pay for the installation costs. The panels were never actually installed, however, and no lease payments were ever received with respect to this lease. The water tank the Woods purchased in December of 1981 was leased in December of 1983 and installed in February of 1984 on a single-family residence in Aurora, Colorado. As of late 1984, only one lease payment had been received. The solar collector panels the Walkers purchased in June of 1981 were leased and installed in December of 1981 and early 1982 on residences in Orem, Provo, and *250 Delta, Utah. The equipment was either improperly installed or leased to the end users by the leasing company's salesmen under the representation that the equipment was being sold to the end users. Either the end users refused to make any lease payments with respect to the Walkers' equipment, or they made a few payments only to demand reimbursement and removal of the equipment. The two control modules the Walkers purchased in June of 1981 were both leased and installed in the summer of 1981 on residential property of end users located in Anabella and Panquitch, Utah. Apparently, due to defective installation of the equipment, the end users did not make the full lease payments that were due and the equipment was eventually removed. The solar collector panels the Stephensons purchased in June and December of 1981 were leased and installed on single-family residences and apartments in Beaver and Sterling, Utah, and in San Diego, California. Apparently due to salesmen's misrepresentations, two of the end users thought the leases ran for 5-year terms rather than 29-month terms. One end user discontinued the lease after the initial 29 months. Another end user renegotiated and renewed *251 the lease after the initial 29 months. The end user in San Diego, California, leased the collector panels of the Stephensons as part of a large solar water heating system for an apartment complex. End-user lease proceeds were received by the Stephensons with respect to all three end-user leases of the collector panels. The two control modules the Stephensons purchased in June of 1981 were leased to end users in Delta and Vernal, Utah. As of the time of trial, one of the end users had made some of the lease payments due. The other had made no payments. The water storage tank the Stephensons purchased in June of 1981 was leased and installed under an end-user lease for a 15-year term on a trailer home in Mt.Pleasant, Utah. The end user made no lease payments on the equipment, and when a bank foreclosed on the mortgage outstanding on the trailer home, the water tank was removed. Based on the end-user lease agreements that were entered into, total end-user lease payments due the Woods, the Walkers, and the Stephensons in 1981, 1982, 1983, and 1984, with respect to their solar water-heating equipment were approximately as follows: 1981
1982
1983
1984
Woods
--  --  --  $ 45 Walkers
$ 131
$ 982
$ 338
$ 323
Stephensons
$ 125
$ 643
$ 736
$ 662
*252 The total lease payments actually received by petitioners in 1981, 1982, 1983, and 1984, from end users with respect to end-user leases of their solar water-heating equipment were as follows: 1981
1982
1983
1984
Woods
--  --  --  $ 5  Walkers
$ 131
$ 982
$ 22 $ 75 Stephensons
$ 125
$ 643
$ 371
$ 604
In 1982 and 1983, the Walkers and the Stephensons inspected property at which some of the equipment they had purchased had been installed. The purpose of the inspections was to verify the installation and condition of their equipment on the property of end users. In March of 1984, Ron Olson (Olson), the financial planner who had recommended the Southwest Solar program to many of the investors and who represented a group of disgruntled Southwest Solar investors, formed a Utah general partnership referred to as "the Save Grumman Panels Partnership" (the SGP partnership). The primary purpose of the SGP partnership was to locate profitable end-user leases for the investors' solar water-heating equipment. The managing partner of the SGP partnership was Ron Olson. The Woods, the Walkers, and the Stephensons became general partners in the SGP partnership. Investors *253 in the SGP partnership (including petitioners) entered into lease or management agreements with the SGP partnership with respect to much of their uninstalled solar water-heating equipment, and then authorized the SGP partnership to obtain their equipment from LMDS and from Southwest Solar. The SGP partnership was to then attempt to lease the equipment to end users. The SGP partnership was to be responsible for installing and maintaining the equipment and for collecting end-user lease payments . To capitalize the SGP partnership, the general partners were required to contribute $ 475 in cash for each piece or component of equipment subject to the management or lease agreement with the partnership. The Woods' capital contribution to the partnership was $ 3,800. The Walkers' was $ 5,000. The Stephensons' was $ 9,025. Net profits or net losses of the SGP partnership were to be allocated to the partners based on their relative cash contributions to the partnership. Under the partners' equipment leases to the SGP partnership, the SGP partnership, not the partners individually, was responsible for paying all of the equipment related expenses incurred during the term of the end-user *254 leases the partnership obtained. In the event, however, refunds of location fees were recovered from LMDS or from Southwest Solar, the partners were to pay half of the total location fees recovered to the SGP partnership. The partners were to receive monthly lease payments from the SGP partnership equal to one-half of their pro rata share of the partnership's net revenues, based on the percentage which their leased equipment represented of the total equipment managed by or leased to the partnership. During 1984, Olson on behalf of the SGP partners contacted Southwest Solar and LMDS and gave notice that the partners in the SGP partnership were terminating their lease and management agreements with LMDS with respect to their uninstalled solar water-heating equipment purchased under the Southwest Solar program. He requested that Southwest Solar and LMDS deliver to the SGP partnership all of the solar water-heating equipment of its partners and also that the previously paid location fees be refunded. Although Olson and the SGP partnership were not successful in obtaining a refund of any portion of the location fees, Olson did obtain from Southwest Solar on behalf of the SGP partnership *255 delivery of approximately 1,600 of the solar collector panels, control modules, and water storage tanks investors had purchased under the Southwest Solar program. As of October of 1985, the SGP partnership had leased to end users approximately 1,400 of these components. Much of the equipment was leased by the SGP partnership to end users for lease payments of $ 11.25 per component per month. Many of the leases were for 7-year terms. Substantially all of the end-user leases covering these components provided for increases in the lease payments of 10 percent per year. Some of the SGP end-user leases included extra energy or water saving devices such as showerhead-flow restrictors, sink aerators, water savers for toilets, and electricity-reducing diodes for light fixtures. The cost of furnishing these extra energy saving devices was relatively small compared to the equipment and installation costs of the solar water-heating equipment. The extra energy savings devices would be sold separately to the end users for approximately $ 221 and would be installed for $ 35. The SGP partnership paid a leasing company approximately $ 2,200 for locating end users and for installing a basic *256 residential solar water heating system utilizing the equipment of the SGP partnership. Where extra energy or water saving devices were included in the installation, the SGP partnership paid the leasing company approximately $ 2,431 for locating the end users and for installing the system. Under the accrual method of accounting, petitioners reported their income and deductions with respect to their investment and leasing activities under the Southwest Solar program. In computing their depreciation deductions and tax credits with respect to their investments in the Southwest Solar program, petitioners allocated the entire total stated purchase price to the equipment. Set forth below are the ordinary deductions and tax credits claimed by petitioners on their 1981 and 1982 Federal income tax returns with respect to the solar water-heating equipment purchased under the Southwest Solar program. Petitioners Marva Hayes and Robert Collin Wood, Sr.:
1981
1982
Depreciation     $ 1,800
$ 4,485
Location fees     2,800
2,800
Roundtrip travel expenses     from Orem, UT, to Oceanside, CA       384
--
Interest     15
734
Franchise fee     --
100
Total deductions claimed each year          $ 4,999
$ 8,119
Investment credit     1,200
1,230
Business energy credit     1,800
1,845
Total credits claimed each year          $ 3,000
$ 3,075
Petitioners Thomas C. and Janice G. Walker:
Depreciation     $ 2,634
$ 7,533
Location fees     2,800
5,600
Interest     566
1,149
Franchise fees     --
100
Legal and professional fees     --
223
Total deductions claimed each year          $ 6,000
$ 14,605
Investment credit     1,756
2,460
Business energy credit     2,634
3,690
Total credits claimed each year          $ 4,390
$ 6,150
Petitioners Robert E. and Frances C. Stephenson:
Depreciation     $ 4,434
$ 9,271
Location fees     5,600
4,200
Interest     589
1,564
Franchise fee     --
100
Total deductions claimed each year          $ 10,623
$ 15,135
Investment credit     2,956
1,845
Business energy credit     4,434
2,768
Total credits claimed each year           $ 7,390
$ 4,613
*257 The tax returns of the Walkers and the Stephensons were prepared by a certified public accountant who was given a copy of the Southwest Solar investment prospectus and who represented to the Walkers and the Stephensons that the tax deductions and credits claimed on their tax returns relating to their investments in the Southwest Solar program were proper. Other than the $ 15 interest deduction claimed by the Woods for 1981, respondent, in respective notices of deficiency to petitioners for 1981 and 1982, disallowed all of the deductions and Federal income tax credits claimed with respect to petitioners' investments in the Southwest Solar program. The notices of deficiency stated that these items were being disallowed because it had not been substantiated, that the deductions or credits were allowable, and (with the exception of the notice of deficiency to the Woods) that no Federal investment and energy credits were allowable because petitioners failed to satisfy the noncorporate lessor rules of section 46(e)(3). In an amended answer with respect to the Woods, respondent asserted that the $ 15 interest deduction claimed by the Woods for 1981 was not allowable and also that the *258 Federal income tax credits in question were not allowable because the noncorporate lessor rules of section 46(e)(3) were not satisfied. OPINION Profit Objective
To be entitled to the deductions and credits claimed with respect to their investments in the solar water-heating equipment offered under the Southwest Solar program, petitioners, among other things, must have entered into the investments with an actual and honest objective of making a profit. Cooper v. Commissioner, 88 T.C. 84, 108 (1987); Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been reasonable, but the taxpayer must have entered into or continued the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Various factors set forth in regulations *259 under section 183 have often been used in the analysis of whether the requisite profit objective exists. No one factor, however, is determinative. See sec. 1.183-2(b), Income Tax Regs. The resolution of whether a profit objective exists is to be made on the basis of all of the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. More weight is to be given to objective facts than to mere self-serving statements of intention. Beck v. Commissioner, 85 T.C. 557, 570 (1985); Siegel v. Commissioner, 78 T.C. 659, 699 (1982). At the outset, we note that investments in and use of solar water-heating equipment was a type of activity which the Federal and State Governments, in the early 1980's, intended to encourage. The Federal and State Governments made substantial tax benefits available to investors and to users of solar water-heating equipment, and the mere fact that investors in the Southwest Solar program took into account and claimed such tax benefits in no *260 way undermines or taints the nature of the basic investment. As we stated in Leahy v. Commissioner, 87 T.C. 56, 72 (1986): we should not disregard the existence of an asset for which Congress intended tax advantages merely because the parties attempted to maximize the advantage of those benefits for one of the parties to a transaction. Respondent should recognize that in instances where there are no shams and depreciable assets exist, some person or entity is entitled to the intended tax advantages. See Estate of Thomas v. Commissioner, 84 T.C. 412, 433-440 (1985). * * * [Fn. ref. omitted.]
At the same time, we have the responsibility to separate the real and the unreal aspects of transactions and to adjust the tax benefits to economic reality and to deter abuse. See Tolwinsky v. Commissioner, 86 T.C. 1009, 1062 (1986). We note that in a prior published opinion of this Court, we concluded that investors in a somewhat similar solar equipment purchase and lease program entered into their transactions with an actual and honest profit objective. See Cooper v. Commissioner, 88 T.C. 84, 108-110 (1987). *261 Taking into account the relevant factors, we conclude that petitioners entered into the transactions with Southwest Solar for the purchase of solar water-heating equipment and the transactions with the various leasing companies and end users with an actual and honest objective of making a profit. Many of the individuals involved in the transactions were not competent or honest in their dealings with the investors and with the end users, and this caused many problems. The prices petitioners agreed to pay for their investments were too high and the allocations of the entire stated purchase price to the equipment were improper, but petitioners, as individual investors, credibly testified that they believed energy savings to the end users of the equipment would be realized over the life of the end-user leases, that substantial end-user lease proceeds would be received, and that end users would experience substantial savings in their public utility bills which would result in the receipt of substantial lease proceeds and profits to petitioners. Petitioners' actions with regard to their investments corroborate their profit objective. Projections of end-user lease proceeds were set *262 forth in the offering prospectus and were considered and relied on by petitioners. The projections turned out to be too high, but petitioners reasonably relied on them at the time of their investments. Significantly, in 1984, petitioners and many of the other investors terminated LMDS when it became apparent LMDS and the leasing companies hired by LMDS were not capable of properly installing and managing the equipment. Petitioners then joined the SGP partnership at substantial out-of-pocket costs to them in an effort to save their investments. Petitioners inspected a number of the installations of their equipment or the property of end users at which the equipment had been installed. Petitioners, in general, were aware of and reasonably relied on the substantial increases in energy prices that were predicted in the early 1980's, and petitioners were aware of the efforts and intentions of the Federal and State Governments to promote investments in solar water-heating equipment. In retrospect, petitioners' investments were not profitable. We are satisfied, however, that petitioners did have an actual and honest profit objective in investing in the solar water-heating equipment *263 at issue in these cases. We so hold. Sham Transaction and Economic Substance
In general, business transactions are given effect consistent with the substance and form of the transactions. When analyzing the substance and form of business transactions, the reality that the tax laws affect the shape of most business transactions cannot be ignored. Frank Lyon Co. v. United States, 435 U.S. 561, 576-580, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). This principle is particularly apropos where very significant tax benefits are made available by the Federal and State Governments for the specific purpose of promoting and stimulating the precise type of investments at issue, as is the situation in the present case. Levy v. Commissioner, 91 T.C. 838, 853 (1988); Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). It also is well established, however, that to be recognized for Federal income tax purposes transactions must have a business purpose and economic substance apart from anticipated tax consequences. Knetsch v. Commissioner, 364 U.S. 361, 365-370, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), *264 affg. 44 T.C. 284 (1965); Hulter v. Commissioner, 91 T.C. 371, 388 (1988). Where taxpayers resort to "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits," the tax benefits claimed will be denied on the basis that the transactions were shams. Cooper v. Commissioner, 88 T.C. 84, 103 (1987); Falsetti v. Commissioner, 85 T.C. 332, 355 (1985). Examinations into the business purpose and economic substance of transactions are inherently factual. Levy v. Commissioner, supra at 854; Larsen v. Commissioner, 89 T.C. 1229, 1252 (1987). The business purpose inquiry tends to be an inquiry of the investors' subjective purpose for entering into the transactions at issue. Levy v. Commissioner, supra at 854; Packard v. Commissioner, 85 T.C. 397, 417 (1985). The economic substance inquiry tends to be an analysis of the objective factors indicating whether the transactions had a reasonable opportunity of producing *265 a profit. Levy v. Commissioner, supra at 854; Packard v. Commissioner, supra at 417. We do not believe that the transactions before us represent sham transactions. Extensive equipment was manufactured, purchased, delivered, leased, and installed with end users under the Southwest Solar program. The investors clearly became owners of solar water-heating equipment and such equipment in many cases was leased to end users. Furthermore, in 1984, through the SGP general partnership, petitioners and many of the other investors asserted ownership rights over the equipment vis-a-vis Southwest Solar and the leasing companies, and they demanded physical delivery of much of the equipment, actions inconsistent with respondent's sham transaction theory. See also Cooper v. Commissioner, supra at 103-104, in which it was concluded that investments under a similarly structured solar water-heating equipment purchase and lease program were not sham transactions. We realize that the equipment was overvalued, the business was mismanaged, the equipment was poorly marketed and installed, and misappropriation of investors' funds *266 occurred by some of the individuals involved, but in spite of these factors, we conclude that petitioners had a legitimate business purpose for entering into these transactions. Petitioners believed their investments in the equipment were viable and sound. They believed their investments would put them in a position to exploit anticipated higher energy prices and to do so through investments that were being encouraged by governmental authorities. When it became apparent that many of the original leasing companies and salesmen were not representing the investors properly with respect to the equipment, many of the investors joined the SGP partnership and made substantial investments in the partnership in a good-faith effort to save their investments. Petitioners have established that they had a profit objective and business purpose for entering into the transactions for the purchase and lease of solar water-heating equipment under the Southwest Solar program. Whether and to what extent the transactions before us had economic substance is a more difficult question. Respondent argues that the total stated purchase price for the solar water-heating equipment purchased under the Southwest *267 Solar program was so inflated over the fair market value of the equipment that the transactions should be regarded qq as having no economic substance and that the investors' promissory notes should be regarded as contingent. In part, we agree with respondent. With regard to the economic substance of the transactions before us, we believe that the transactions had economic substance and should be recognized for Federal income tax purposes to the extent that the purchase price to the investors (including petitioners herein) was supported by the value of the solar water-heating equipment and associated contract rights received by the investors. To the extent the amounts paid by the investors were not supported by underlying assets with value, the transactions had no economic substance and the debt associated with that portion of the purchase price must be disregarded as lacking in economic substance, and as a mere contingent liability. Both parties offered expert testimony concerning the value of the solar water-heating equipment and the value of the associated contract rights the investors received relating to the obligations of the leasing and management companies to find end users *268 for the equipment, to install the equipment, and to maintain the equipment. Two of the experts -- Thomas Debin (Debin) for petitioners and Geoffrey Smith (Smith) for respondent -- came to substantially the same basic dollar valuations for the equipment. Their valuations of the equipment corresponded closely to Grumman's suggested retail prices for the equipment. We agree and conclude that the fair market value of the equipment on the date of purchase thereof by the investors in the Southwest Solar program was equal to the retail prices therefor as set forth in our findings of fact. Petitioners argue that any portion of their total stated purchase price for the solar water-heating equipment that is found not to be attributable to the equipment should still be recognized and should be allocated to the intangible value or rights accruing to the investors in connection with the obligations of the leasing and management companies, on behalf of the investors, to lease to end users, to install, to maintain, and to release the equipment. Petitioners then argue that any amount allocated to the intangible value or contract rights should be amortized, for Federal income tax purposes, over *269 the first 2 years of the original management contract with LMDS. Respondent argues that any amount allocated to the intangible contract rights of the investors should be amortized for 1981 and 1982, over the entire original 15-year term of the management contract with LMDS. In Cooper v. Commissioner, supra, an allocation approach similar to that suggested by petitioners herein was adopted. The full difference between the value of the equipment purchased and the total stated purchase price for the investment was allocated to the intangible contract rights, and the full principal amount of the investor debt associated therewith was recognized for Federal income tax purposes. We stated therein as follows: As previously stated, petitioners received more than solar water-heating equipment -- they received a package which consisted of equipment, the attendant tax benefits of acquiring such equipment, contract rights, and a potential stream of income. Thus, only a part of the purchase price was fairly allocable to the equipment; * * * * * * However, such a determination does not mean that petitioners overpaid * * * for what they received or that the notes *270 were not bona fide. Rather, petitioners purchased a package consisting of equipment, valuable contract rights, and a potential stream of income * * * we believe that this package was worth all that petitioners paid for it. [88 T.C. at 110-111.]
In this case, as explained , Debin and Smith largely agree on the value of the solar water-heating equipment. They disagree, however, on the value of the contract rights the investors in the Southwest Solar program obtained relating to the various obligations of LMDS and the leasing companies. Debin was of the opinion that LMDS would have to pay a sales commission of $ 750 to the leasing companies with respect to each end-user lease of a basic residential solar water heating system and that the installation costs of such a system would be an additional $ 2,730. Smith, on the other hand, was of the opinion that the sales commission would be no more than $ 350 and that the typical installation cost for a four-component residential solar system would be $ 1,125. We note and are troubled by the fact that LMDS and the leasing companies agreed to find end-user leases and to have the equipment installed for only the $ 1,400 *271 location fee (per four components) and to manage and maintain the equipment only for a percentage of the end-user lease rentals. In essence, LMDS and the leasing companies agreed to assume some of the substantial risks associated with the end-user leases, to look substantially to the end-user lease proceeds for compensation relating to their management and maintenance of the equipment, and not to look to any further payment from the investors. Thus, we have some difficulty allocating any significant portion of the investors' total stated purchase price (in excess of the location fees) to the intangible contract rights. Nevertheless, based on the experts' testimony described above, we conclude that the value to the investors of the various intangible contract rights they received upon their investments in the Southwest Solar program was $ 2,500 (per each four pieces or components of equipment). This represents $ 1,400 attributable to the initial obligations of LMDS to find end users and to install the equipment (to be paid for by the locations fees) and an additional amount of $ 1,100 attributable to the additional installation (including installation materials), maintenance, and *272 release obligations of the management and leasing companies on behalf of the investors. This total $ 2,500 relating to the value of the intangible contract rights (per four components) combined with the value of the equipment itself, as determined herein, represents the true value and true economic substance of the transactions entered into by the investors. Only to that extent do the individual investors have a tax basis in their transactions under the Southwest Solar program. Petitioners' tax basis in their solar water-heating equipment, for depreciation and tax credit purposes, is limited and controlled by the fair market value of the equipment purchased. Cooper v. Commissioner, 88 T.C. 84, 111 (1987). Similarly, the $ 2,500 balance (per four components) of petitioners' tax basis in their investments in the Southwest Solar program is allocable to the intangible rights petitioners received relating to the obligations of the management and leasing companies to install and maintain the equipment. This amount is amortizable for the 2 years before us (namely, for 1981 and 1982) on the basis of the 15-year original life of the management agreement with LMDS. *273 Sec. 1.167(a)-3, Income Tax Regs. The fact that the management agreement might be terminated during the first 2 years and that such termination would result in a forfeiture of a portion of the location fees is no basis for amortizing the value of the intangible contract rights over just the first 2 years of the 15-year management contract then in effect. The balance of petitioners' stated purchase price for their investments in the Southwest Solar program is not supported by anything of value and is not supported by economic substance. As explained, the underlying value of the equipment does not support this portion of the transaction. Further, for the entire 15-year term of the investors' promissory notes, the investors have no obligation to make a single payment of principal or interest, other than from a share of the end-user lease proceeds. In summary on this issue, based on the facts and circumstances of this case, the principal amount of petitioners' promissory notes and debt obligations associated with their investments under the Southwest Solar program, in excess of the combined value, as determined herein, of the equipment and the intangible contract rights (and after *274 subtracting the cash invested) is to be treated as contingent debt, with respect to which petitioners have no tax basis and with respect to which no interest deductions can accrue for Federal income tax purposes. See generally Waddell v. Commissioner, 86 T.C. 848, 901-903 (1986), affd. per curiam on other issues 841 F.2d 264 (9th Cir. 1988). To the extent not treated as a contingent debt herein, the principal amounts of the written promissory notes are recognized as valid indebtedness. The schedule below summarizes the specific manner by which our conclusions herein affect the particular investments made by petitioners herein under the Southwest Solar program: Additional
Total Value of
Investor
Petitioners'
Retail Value Location
Intangible
Basis in
Transactions
of Equipment Fees
Rights
Transaction Woods
Dec. 1981
1 "B" unit  $ 3,010
$ 2,800
$ 2,200
$ 8,010 Dec. 1982
2 "D" units  $ 3,392
$ 2,800
$ 2,200
$ 8,392 Walkers
June 1981
2 "A" units  $ 4,742
$ 2,800
$ 2,200
$ 9,742 Nov. 1982
4 "D" units  $ 6,784
$ 5,600
$ 4,400
$ 16,784
Stephensons
June 1981
2 "A" units  $ 4,742
$ 2,800
$ 2,200
$ 9,742 Dec. 1981
1 "B" unit  $ 3,010
$ 2,800
$ 2,200
$ 8,010 *275 Total Stated
Purchase
Amount of Price Claimed Petitioners'
& Location
Basis Transactions
Fees
Disallowed
Woods
Dec. 1981
1 "B" unit  $ 14,800
$ 6,790 Dec. 1982
2 "D" units  $ 15,100
$ 6,708 Walkers
June 1981
2 "A" units  $ 20,360
$ 10,618
Nov. 1982
4 "D" units  $ 30,200
$ 13,416
Stephensons
June 1981
2 "A" units  $ 20,360
$ 10,618
Dec. 1981
1 "B" unit  $ 14,800
$ 6,790 The schedule below reflects more particularly the principal amounts of the promissory notes that are recognized herein: Portion of
Portion of
Total Petitioners'
Petitioners'
Petitioners'
[4] Cash Paid and
Promissory
Promissory
Petitioners'
Total
Deferred Portion
Notes Notes not Transactions
Basis
of Location Fee Recognized
Recognized
Woods Dec. 1981
$ 8,010 $ 6,900 $ 1,010 $ 6,890 Dec. 1982
$ 8,392 $ 7,200 $ 1,192 $ 6,708 Walkers
June 1981
$ 9,742 $ 8,800 $ 942   $ 10,618
Nov. 1982
$ 16,784
$ 13,600
$ 3,184 $ 12,616
Stephensons
June 1981
$ 9,742 $ 8,800 $ 942   $ 10,618
Dec. 1981
$ 8,010 $ 6,900 $ 1,010 $ 6,890 *276 Accrual of Interest Deductions
Respondent argues that even if a portion of petitioners' debt obligations are recognized, under the all-events test of section 1.461-1(a)(2), Income Tax Regs., petitioners should not be allowed to accrue interest thereon. We note that the $ 700 deferred portion of the location fees accrued no interest, and petitioners have not accrued any interest deduction with regard thereto. Petitioners accrued the income with regard to their solar equipment leasing activities, and they accrued interest deductions on the promissory notes at a simple 9-percent annual rate. We fail to see how the allowance of the claimed interest deductions (accrued only against the principal amount of the promissory notes that is recognized herein) will distort petitioners' income or fail the all-events test of the regulations under section 461. As we have found, the interest accrues with no compounding on a relatively small debt principal. The underlying debt principal, to the extent recognized herein for Federal income tax purposes, is a liability with respect to which petitioners are personally liable, and, during the years before us, no further contingencies limit petitioners' *277 personal liability therefor as it accrues each year. We conclude that the accrual of interest deductions on the portion of the principal amount of petitioners' 9-percent promissory notes that is recognized herein for Federal income tax purposes satisfies the accrual principles of section 446 and does not distort petitioners' income. See Burnham Corp. v. Commissioner, 90 T.C. 953, 959 (1988), affd. 878 F.2d 86 (2d Cir. 1989); Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 34-35 (1988). Qualified Property, Placed In Service, and Noncorporate Lessor Rules
Respondent asserts that the investment and energy credits petitioners claimed are not allowable because the solar water-heating equipment was not qualified section 38 property, because it was not placed in service during the years the credits were claimed, and because the transactions petitioners entered into failed to satisfy the noncorporate lessor rules of section 46(e)(3). Section 38 allows investment credits for investments in "section 38 property," defined in section 48(a)(1) as, among other things, "tangible personal property" or "other tangible property (not *278 including a building and its structural components)." Section 1.48-1(c), Income Tax Regs., defines tangible personal property as "tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." Included generally within the term structural components of buildings are plumbing and plumbing fixtures and other components relating to the operation and maintenance of a building. Sec. 1.48-1(e)(2), Income Tax Regs.
Property which is temporarily, as opposed to permanently, attached to a building is generally not regarded as a structural part thereof. King Radio v. United States, 486 F.2d 1091 (10th Cir. 1973); Minot Federal Savings & Loan Assn. v. United States, 435 F.2d 1368 (8th Cir. 1970); Consolidated Freightways, Inc. v. Commissioner, 74 T.C. 768, 797-798 (1980), revd. in part and affd. in part 708 F.2d 1385, 1388 (9th Cir. 1983); Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664, 672-673 (1975). Factors, among others, that must be considered include *279 the function and design of the property at issue, the intent of the taxpayers in installing the property on the building, and the effect of removal of the property from the building. In Cooper v. Commissioner, supra at 115, the qualification as investment credit property of solar water-heating equipment similar to that at issue herein was not challenged by respondent. We conclude that the solar water-heating equipment at issue in this case qualifies as section 38 property. Admittedly, the equipment is designed to be integrated with existing water heating systems. The hot water produced replaces that which would otherwise be produced by the buildings' existing conventional water heating systems. The solar water-heating equipment, however, is neither designed, nor intended to completely replace the conventional water heating system, nor to be the sole source of hot water. The equipment is easily removed. Removal is neither costly, nor time consuming. No damage generally is caused to the buildings as a result of removal of the solar water-heating equipment. The basic components may be reused and installed on other buildings. Installation and removal *280 of the equipment at issue in this case on larger buildings (e.g., on multi-unit residential property) may be somewhat more complicated and expensive. Even on such installations, however, the equipment can be readily removed and reused, without materially affecting the operation or structure of the building. We find that petitioners' solar water-heating equipment qualifies as section 38 property. This holding obviously only pertains to the value of and petitioners' tax basis in the solar water-heating equipment, as determined herein, and not to the value of the intangible contract rights. Petitioners treated the equipment purchased under the Southwest Solar program as placed in service in the year they entered into the transactions with Southwest Solar and the management and leasing contracts with LMDS. Depreciation deductions and investment and energy credits, however, generally are allowable in the year in which the qualifying property is actually placed in service. Secs. 38(a), 46(a)(1), 46(a)(2), 46(c)(1); secs. 1.46-3(a)(1), 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs.
Property is placed in service when it is "placed in a condition or state of readiness and availability *281 for a specifically assigned function, whether in a trade or business, [or] in the production of income." Secs. 1.46-3(d)(1)(ii), 1.167(a)-11(e)(1)(i), Income Tax Regs. Further, "it is not necessary that the property actually be used during the taxable year in the taxpayer's profit-motivated venture. It is sufficient that the property be available for use." Waddell v. Commissioner, 86 T.C. at 897; Cooper v. Commissioner, 88 T.C. at 113-114. As indicated in our findings, some of the equipment petitioners purchased under the Southwest Solar program was not manufactured until after the close of the year with respect to which petitioners claimed depreciation deductions and tax credits with respect to the equipment. We hold that petitioners' Grumman solar water heating collector panels and control modules were placed in service on the latter of: (1) The date petitioners concluded their purchase agreements for the equipment; or (2) the date on which the equipment actually was shipped by Grumman, as determined by Grumman's records. Certainly, the equipment cannot be regarded as available for use or lease by petitioners until the equipment was shipped *282 by Grumman. The specific dates that petitioners' collector panels and control modules were placed in service, under the above test, are set forth in our findings of fact. The record reflects that, with regard to petitioners' water storage tanks, as of October of 1984, the two tanks the Walkers purchased in June of 1981 and three of the four water tanks the Stephensons purchased in June and December of 1981 were not yet delivered to the Walkers or to the Stephensons, nor apparently to any of the leasing companies on their behalf. The fourth water tank the Stephensons purchased was placed in service in August of 1982, which year for the Stephensons is not before us. The records in evidence indicate that the Woods' two water tanks were first placed in service in August of 1983 when they were shipped to a warehouse in Albuquerque, New Mexico. The burden of proof on this issue with regard to the water tanks lies with petitioners. Rule 142(a). On the record before us, we find that none of petitioners' water tanks was placed in service during the years at issue. Respondent also contends that petitioners' leases of solar water-heating equipment fail to satisfy the noncorporate lessor *283 rules of section 46(e)(3). Petitioners, among other things, contend that the installation of the equipment on property of end users and the integration of the equipment into complete solar water heating systems constitutes the "manufacture" of the equipment and that they, therefore, under section 46(e)(3)(A), satisfy the noncorporate lessor rules. It is clear that petitioners did not manufacture the equipment with respect to which they are claiming investment and energy credits, nor can they be regarded as having manufactured the integrated systems. We so hold. Grumman was the manufacturer of the solar collector panels and control modules, and various other companies manufactured the water tanks. If anyone can be regarded as having manufactured, under section 46(e)(3)(A), the integrated solar water heating systems as installed on the property of end users, it is only the installation companies, not petitioners. See Egizii v. Commissioner, 86 T.C. 450, 455-456 (1986); Carlson v. Commissioner, 79 T.C. 215, 222-223 (1982), affd. 712 F.2d 1314 (9th Cir. 1983). Petitioners alternatively argue that they, as noncorporate lessors, *284 satisfy the twofold requirements of section 46(e)(3)(B) (namely, that the leases, including certain options to renew, were less than 50 percent of the equipment's useful life and that for the first 12 months after the equipment was transferred to the end-user lessees, the sum of the tax deductions allowed to the lessors of the equipment solely by reason of section 162 (other than rents and reimbursed amounts) exceeded 15 percent of the lease proceeds produced by the lease of the equipment). Sec. 1.46-4(d)(1), Income Tax Regs. The parties agree that for purposes of the less-than-50-percent-of-the-useful-life test of section 43(e)(3)(B), petitioners' solar water-heating equipment has a useful life of 20 years. Petitioners, therefore, maintain that all of the "leases" they entered into with the leasing companies (SELCO and Stellar) satisfy this test because the term of such leases was just 12 months. Alternatively, petitioners maintain that the leases with the end users satisfy this test because the terms of the end-user leases generally were for 29 months and that those that were for longer terms often were canceled and should be judged based on the actual terms of the end-user *285 leases, not the originally stated terms. Respondent argues that the agreements between the investors in the Southwest Solar program and the leasing companies were not leases at all, but were only management agreements, and that for 1981 and 1982, the less-than-50-percent-of-the-useful-life test must be applied to the end-user leases as originally entered into, not as modified in later years. With regard to the end-user leases, respondent agrees that the end-user leases with 29-month terms met the useful-life test, but respondent argues that the end-user leases that exceeded 10-year terms fail the useful-life test of section 46(e)(3)(B). We agree with respondent and so hold. The agreements entered into between the investors (including petitioners herein) and the leasing companies were not leases, but were only management agreements. The investors retained the risk of loss with respect to the equipment vis-a-vis the end users, and the investors and LMDS, on the investors' behalf, maintained control over the property. The leasing companies did not have any risk of loss with regard to the equipment, nor did they have significant control over the equipment. See Freesen v. Commissioner, 84 T.C. 920, 940 (1985), *286 revd. on another issue 798 F.2d 195 (7th Cir. 1986); AMERCO v. Commissioner, 82 T.C. 654, 670 (1984). Based on the above conclusion, the purported leases with the leasing companies are not relevant in determining whether the noncorporate lessor rules of section 46(e)(3) are satisfied. It is the provisions of the end-user leases that must be analyzed and that control whether the leases satisfy the noncorporate lessor rules. Where equipment is purchased and available for lease but actually is not leased during the year, the manner by which the requirements of section 46(e)(3) are to be measured is not clear. All parties in this case, however, argue that whether the requirements of section 46(e)(3) are satisfied should be determined under the various agreements between the management and leasing companies and the end users. With regard to the 50-percent-of-useful-life test of section 46(e)(3), it does appear that most of the anticipated end-user leases would qualify since they generally were to be for periods shorter than 10 years (i.e., less than one-half of the 20-year stipulated useful life of the equipment). With regard to the 15-percent *287 expense test of section 46(e)(3), it does appear that the anticipated end-user leases designed under the Southwest Solar program would not qualify since the investors only had the responsibility to pay a 7-percent management fee to LMDS and a 3-percent leasing fee to the leasing companies, for total expenses per year of 10 percent of the total end-user lease income. Petitioners, however, argue that at least a part of the $ 700 cash portion of the location fees paid by the investors to LMDS currently is deductible under section 162 and should be added to the 7-percent management fee and the 3-percent leasing fee, and that under this calculation the 15-percent expense test of section 46(e)(3) would be satisfied. Respondent argues, and we agree, that the entire location fee should be capitalized. It represents a significant, front-end expenditure that was to produce benefits to the investors over the life of the management contract and end-user leases. Fall River Gas Appliance Co. v. Commissioner, 349 F.2d 515 (1st Cir. 1965), affg. 42 T.C. 850 (1964); Renwick v. United States, 87 F.2d 123 (7th Cir. 1936); Young v. Commissioner, 59 F.2d 691 (9th Cir. 1932), *288 affg. 20 B.T.A. 692 (1930); Munger v. Commissioner14 T.C. 1236, 1238-1239 (1950). See further, Strouth v. Commissioner, T.C. Memo 1987-552; Thielking v. Commissioner, T.C. Memo 1987-201. Based on the arguments of the parties, we conclude that petitioners' leases with end users fail to meet the 15-percent expense test of section 46(e)(3). Miscellaneous Expenses
On their respective returns, petitioners claimed current business expense deductions with respect to the location fees paid to LMDS and with respect to certain minor expenses incurred in connection with their investment in the Southwest Solar program. The Woods claimed travel expenses of $ 384 to travel to California to inspect the equipment. The Walkers claimed $ 221 in legal expenses. The Woods and the Walkers claimed the $ 100 fee for a brochure relating to equipment leasing. Respondent disallowed all of these deductions claimed by petitioners. Section 162 allows a deduction for all of the ordinary and necessary expenses incurred in carrying on a trade or business. Generally, however, no deduction may be taken for capital expenditures, *289 which must be capitalized absent a clear statutory provision to the contrary. Commissioner v. Lincoln Savings and Loan Assn., 403 U.S. 345, 352-358, 29 L. Ed. 2d 519, 91 S. Ct. 1893 (1971); Woodward v. Commissioner, 397 U.S. 572, 573-576, 25 L. Ed. 2d 577, 90 S. Ct. 1302 (1970). We have found that the location fees were nondeductible capital expenditures. The travel expenses of the Woods, the legal expenses of the Walkers, and the brochure fees of the Woods and the Walkers, however, all represent nominal, ordinary and necessary business expenses relating to petitioners' leasing activities, and are deductible. Additions to Tax
Section 6653(a)(1) provides an addition to tax equal to 5 percent of the underpayment if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition of half of the interest on the portion of the underpayment attributable to negligence. Negligence under section 6653(a)(1) and (2) is the failure to exercise due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), *290 affg. a Memorandum Opinion of this Court; Neely v. Commissioner, 85 T.C. 934, 937 (1985). In spite of underpayments in tax for the years in issue, we find that petitioners are not liable for the additions to tax for negligence. We previously have determined that petitioners' purchase and leasing activities had a profit objective and that their transactions were not sham transactions. The Walkers and the Stephensons reasonably believed that all of the equipment they purchased existed and was available for lease to end users. Furthermore, the Walkers and the Stephensons in good faith reasonably relied on an independent accountant who prepared their returns and to whom they gave the prospectus concerning the Southwest Solar program. See Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. a Memorandum Opinion of this Court; Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988), affg. a Memorandum Opinion of this Court. The Woods inspected the equipment, discussed the investment with their financial planner, and reasonably relied on representations made in the Southwest Solar investment prospectus. Section 6659 *291 provides for an addition to tax for underpayments of tax attributable to valuation overstatements. A valuation overstatement exists, among other situations, if the adjusted basis of property claimed on the return equals or exceeds 150 percent of the correct amount of the basis. As to the years at issue for valuation overstatements of 150 percent or more but not more than 200 percent, the addition is 10 percent of the underpayment attributable to the valuation overstatement; for valuation overstatements of more than 200 but less than 250 percent, the addition is 20 percent of the underpayment attributable to the valuation overstatement; for valuation overstatements of 250 percent or more, the amount of the addition is 30 percent of the underpayment attributable to the valuation overstatement. No addition is imposed under section 6659 unless the underpayment in tax attributable to the overvaluation overstatement is at least $ 1,000. To the extent a taxpayer claims tax credits and depreciation on equipment that are disallowed on grounds separately and independently from the alleged valuation overstatements, the resulting underpayments are not regarded as "attributable to valuation *292 overstatements." Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). For example, where equipment was not placed in service and where the underlying leasing activity fails to satisfy the noncorporate lessor rules of section 46(e)(3), the taxpayer -- regardless of any overstatements in the value of the equipment -- is not entitled to any credits or deductions with respect to such equipment. Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. a Memorandum Opinion of this Court; McCrary v. Commissioner, 92 T.C. 827, 851-855, 859-860 (1989); Todd v. Commissioner, supra.
For the years in issue, petitioners claimed an adjusted basis in their solar water-heating equipment equal to the total stated purchase price for petitioners' investments in the Southwest Solar program. The adjusted basis claimed exceeded 250 percent of the equipment's basis as determined herein. Section 6659(e) authorizes respondent to waive all or part of the valuation overstatement addition to tax if the taxpayer establishes that there was a reasonable basis for the adjusted basis *293 claimed on the return and that such claim was made in good faith. Respondent's refusal to waive the section 6659 addition to tax is reviewable by this Court. A taxpayer, however, must show that respondent's refusal to waive the addition to tax constitutes an abuse of respondent's discretion. See Brand v. Commissioner, T.C. Memo 1988-194. In this case, petitioners have not established that respondent abused his discretion in failing to waive the section 6659 addition to tax. Petitioners are liable for the additions under section 6659, assuming that the respective underpayment for each year attributable to the valuation overstatements is at least $ 1,000. As indicated, the section 6659 addition to tax does not apply to the extent the underpayments also are attributable to the disallowance of deductions and credits under the placed-in-service rule and/or the noncorporate lessor rules of section 46(e)(3). Respondent asserts that the Woods and the Walkers for 1982 are liable for additions to tax for substantial understatements under section 6661, equal to 10 percent of their respective understatements. [5] In order for an understatement of tax to be considered *294 substantial, the amount must exceed the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). While no section 6661 addition is imposed against the portion of an understatement that also is subject to an addition to tax under section 6659, such portion is taken into account in determining whether the 10 percent or the $ 5,000 threshold amount is met. Sec. 1.6661-2(f), Income Tax Regs.
*295 Respondent contends that the additions under section 6661 should be imposed because under section 6661(b)(2)(B)(i) and (ii) there was no substantial authority supporting the claimed treatment of the disallowed items, and because petitioners did not adequately disclose on their returns the relevant facts concerning the disallowed items. Petitioners argue that even if they are otherwise determined to be liable for the section 6661 additions to tax, respondent should have waived the additions. Petitioners have not established that they had substantial authority supporting their treatment of the disallowed items, nor did they adequately disclose on their returns the relevant facts affecting the treatment of the disallowed items. Petitioners have not established that respondent abused his discretion in not waiving the section 6661 additions to tax. Mailman v. Commissioner, 91 T.C. 1079 (1988). The Woods and the Walkers are liable for the section 6661 additions to tax for 1982. The parties in their computations under Rule 155 are directed to calculate whether the section 6661(b)(1)(A) threshold amount is met. Section 6621(c) provides for an increased rate of *296 interest for substantial underpayments attributable to tax-motivated transactions. A substantial underpayment is defined as an underpayment in excess of $ 1,000. Among the types of transactions that are considered to be tax-motivated transactions are valuation overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). As with the section 6659 addition to tax, the section 6621(c) increased rate of interest does not apply to the extent the underpayments are attributable to the disallowance of deductions and credits under the placed-in-service rule and/or the noncorporate lessor rules of section 46(e)(3). We have previously determined that petitioners for the years in issue have underpayments attributable to valuation overstatements. Petitioners will be liable for increased interest under section 6621(c), assuming their respective underpayments for each year attributable to the valuation overstatements exceed $ 1,000. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert E. and Frances C. Stephenson, docket No. 11979-85, and Thomas C. and Janice G. Walker, docket No. 11980-85.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
**. 120 percent of the interest due on the total amounts of the deficiencies.↩
*. 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment attributable to negligence.↩
*. 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment attributable to negligence.↩
**. 120 percent of the interest due on the total amount of the deficiency.↩
3. The use in our findings of fact of words such as "purchasing," "purchased," and "sold" are for convenience and are not intended as ultimate findings as to the character of the transactions the investors entered into.↩
4. Total cash paid includes petitioners' cash downpayments and cash portion of location fees.↩
5. As originally enacted by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 323(a), 96 Stat. 613, the amount of the addition to tax under sec. 6661(a) was 10 percent of the addition to tax attributable to the substantial understatement. The amount of the addition was increased to 25 percent of such underpayment by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1951. The amendment made by Pub. L. 99-509, sec. 8002(a), increasing the rate of the sec. 6661 addition to 25 percent, applies to all additions assessed after the date of enactment of Pub. L. 99-509. Pallottini v. Commissioner, 90 T.C. 498↩ (1988). Respondent, however, has not sought to increase the sec. 6661(a) additions to tax above the 10 percent amount set forth in his notice of deficiency issued to the Walkers or above the 10 percent amount set forth in his amendment to answer with respect to the Woods.