**Deborah L. JOHNSON, et al.**

v.

**The UNITED STATES.**

**Nos. 267–89T, 274–89T, 343–89T, 482–89T, 90–508T and 91–1017T.**

United States Court of Federal Claims.

Feb. 15, 1995.

Fred R. Harbecke, Chicago, IL, attorney of record, for plaintiffs.

Robert Stoddart, Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant.

## OPINION

HARKINS, Senior Judge.

Plaintiffs in these six consolidated cases seek refunds of income taxes. Their income tax reports claimed depreciation deductions, investment tax credits, and energy tax credits, from investments in programs that involved so-called leveraged leasing of solar energy equipment. The depreciation deductions and tax credits were disallowed, the additional assessments have been paid, and the claims for refunds have been denied.

The complaints identified 161 individuals in a numbered list of 87 plaintiffs, 74 of which involved joint returns filed by husband and wife and 13 were individuals. The solar energy investment program was active from 1981 through 1985. Tax years relevant to plaintiffs' claims are 1982, 1983, 1984, and 1985. Some of the initial plaintiffs have been dismissed by stipulation. Appendix A lists the remaining plaintiffs by name, investment year and number of units purchased.

Plaintiffs' claims were the subject of an 8–day trial during the period from July 26 to August 4, 1993. Posttrial briefing was concluded on April 7, 1994. Plaintiffs' proposed findings of fact were numbered 1 to 311; defendant's proposed findings of fact were numbered 1 to 363. On March 12, 1993, the parties filed a joint stipulation of fact that contained five items, which was adopted in the order closing proof. Appendix B lists facts that control the disposition of plaintiffs' claims.

Plaintiffs, as a group, include CPAs, securities brokers/dealers, securities representatives, insurance brokers, and other profes-

sionals. In the relevant years, many possessed investment portfolios, all were sophisticated investors. The solar energy program in which they invested was started in 1981 to take advantage of business opportunities foreseen to accompany rising energy costs and tax incentives designed to promote investments in alternative energy sources. The investment program was controlled and operated by seven individuals who were the principal officers in two corporations located in Northbrook, Illinois, Solargistics Corporation (Solargistics) and Geodesco, Inc. (Geodesco).

All four of the principal officers active in Solargistics were CPAs, three had been employees of the IRS, and one also was an attorney. Of the three principals in Geodesco, one was an attorney, two had backgrounds in operating a business as well as some knowledge of the solar energy industry.

Operations in the investment program did not involve many employees. In 1982, Solargistics had three full-time employees in the Northbrook office, and Geodesco had 10 to 15 full-time employees. Geodesco operated through dealerships, which were responsible for their own employees.

Organization and operations of the investment program did not require full time attention of the two promoters, each of whom owned 50 percent of Solargistics shares, acted as its officers, and were its sole directors. One devoted 20–25 hours per week in 1982, and 15 hours per week in 1983 and 1984; the other devoted 10–20 hours per week Spring 1982, 40–60 hours per week in Fall 1982, 25–30 hours per week during 1983, and full time for both Solargistics and Geodesco during 1984. Each received compensation of approximately $60,000 in 1982 and $30,000 in 1983.

Solargistics' promotional materials, Equipment Brochures and Transaction Summaries, described investment credit and depreciation allowances, with emphasis on income tax benefits. The 1982 summary stated that for a net cash outlay of $5,600, with no further surviving personal obligation, the equipment transaction would produce an effective tax writeoff of $15,600. The 1983 summary stated that for a net cash outlay of $6,500 in

1983, and $800 in 1984, with no future outlay, the equipment transaction would produce an effective tax writeoff of $16,125 during the year of purchase. The summary for 1984 asserted the same benefits. The promotional materials for 1982 and 1983 were written by the person that had organized Solargistics and Geodesco.

Solargistics' investment program was designed as a leveraged leasing vehicle. The purchase documents required to be executed with initial payment included: (1) Purchase Agreement; (2) Equipment Rental Agreement; (3) Option Agreement; (4) Assignment of Option Premium Proceeds; and (5) Maintenance Agreement. The promotional brochures described the transaction as a purchase of solar equipment from a manufacturer, through Solargistics, with 75 percent of the purchase price financed by the manufacturer, through Solargistics. The purchase was subject to a lease of the equipment to Geodesco and a rental agreement with Geodesco. The lessee would sublease to end users, and remain liable to the investor on the rental contract. This arrangement, however, does not conform to the approved type of leveraged equipment lease that had developed in the 1970s and was recognized as acceptable business techniques.

Sheldon Drobny, a principal in Solargistics' organization and operations, testified that the arrangement did not represent either a simple leveraged leasing transaction nor a complex leveraged leasing transaction such as were depicted schematically in 1988 CCH Tax Transactions Library, Equipment Leasing: Vol. 2, ¶ 12.01. Mr. Drobny used these diagrams as a testimonial aid.

Rev.Proc. 75–21, 1975–1 C.B. 715, sets forth guidelines used by the IRS to determine whether certain transactions purporting to be leases of property are, in fact, leases for income tax purposes. Solargistics' program was not submitted to the IRS for an advance ruling. The type of transaction covered by the IRS procedure, commonly called a "leveraged lease," was described:

Such a lease transaction generally involves three parties: a lessor, a lessee and a lender to the lessor. In general, these

leases are net leases, the lease term covers a substantial part of the useful life of the leased property, and the lessee's payments to the lessor are sufficient to discharge the lessor's payments to the lender.

*Id.* at 715.

In the 1970s, equipment leasing became an established service industry for a variety of capital goods, ranging from jet planes, railroad cars, automobiles, computers, special industry machinery, to miscellaneous capital goods such as restaurant equipment. Government publications noted equipment leasing accounted for 15 percent of capital investment spending in 1976, and the volume was expected to continue upward to accompany market developments. In the Commerce Department publication, a leveraged lease was defined:

> A lease in which the lessor borrows a portion of the purchase price of the leased equipment from institutional investors. In a typical transaction, 20 to 40% of the purchase price is provided by one or more investors who become owners and lessors of the equipment. The balance of the purchase price is borrowed from institutional investors on a non-recourse basis to the owner. The borrowing is secured by a first lien on the equipment, an assignment of the lease, and an assignment of the lease rental payments. A leveraged lease may also refer to transactions in which a lessor finances equipment to be leased by borrowing from a bank or some other lending agency, using the lease and equipment as security.

BUREAU OF DOMESTIC COMMERCE, U.S. DEPT. OF COMMERCE, EQUIPMENT LEASING AND RENTAL INDUSTRIES: TRENDS AND PROSPECTS 26 (1976).

The leasing program undertaken by Solargistics and Geodesco departs significantly from these definitions of a typical leveraged lease. One difference is the absence of a third party as the source of financing for the balance of the purchase price of the equipment. Other differences include: the attenuated course, from end user to installer to Geodesco to investor, of money needed to recoup the original cash investment and payment of the obligation to the lender; Solar-

gistics acting as both the manufacturer and the lender, and Geodesco's multiple functions as a lessee.

On April 30, 1983, Solargistics made a rescission offer to investors who had purchased solar energy equipment packages and had executed the purchase documents in the Solargistics 1981 program and 1982 program. The rescission offer was stated to be a precaution to assure the programs had not been sold in violation of the securities laws. The offer of rescission recognized that Solargistics was the lender and that material parties included divisions of Geodesco. The Rescission Offer stated:

> Under the 1982 Program, 75% of the purchase price of the 1982 Equipment was financed (non-recourse) by Solargistics at an annual interest rate of 9% for 10 years. Each system so purchased was already subject to a 3 year equipment rental agreement with Geodesco, Inc., as lessee, which provided, among other things, for: a $2,487.30 annual rental and a $2,500 rental termination equipment removal fee to be paid by the lessee to the Purchaser following the termination of the equipment rental agreement.
>
> \* \* \* \* \* \*
>
> The material parties involved in Solargistics 1981 Program and 1982 Program are Solargistics Corporation, Geodesco, Inc., Geodesco Finance Company, Geodesco Lease Company and Geodesco Energy Services.
>
> \* \* \* \* \* \*
>
> Geodesco is primarily engaged in the business of procuring by lease, distributing, supplying and subleasing solar energy equipment. In this capacity, Geodesco leases, and in turn supplies and subleases such equipment (directly or through one of its divisions such as Geodesco Lease Company) and it also frequently arranges and/or provides financing for persons who purchase such equipment (directly or through one of its divisions such as Geodesco Finance Company).
>
> \* \* \* \* \* \*

*Geodesco Finance Company*

Geodesco Finance Company ("Geodesco Finance") is a division of Geodesco. As part of the 1981 Program, Geodesco Finance provided Purchasers with financing for up to 80% (75% non-recourse, 5% with recourse) of the purchase price of the 1981 Equipment at an interest rate of 9% per annum for slightly in excess of 10 years. (See "the 1981 Program").

*Geodesco Lease Company*

Geodesco Lease Company ("Geodesco Lease") is a division of Geodesco. Pursuant to the 1981 Program, Geodesco Lease was the lessee of the solar energy equipment (purchased by Purchasers) and in turn supplied or subleased such equipment to the end-users. (See: "Geodesco, Inc." and "The 1981 Program".)

*Geodesco Energy Services*

Geodesco Energy Services ("GES") is a division of Geodesco. Pursuant to the 1982 Program, GES has been responsible for generating leads for leases and actual installation of the systems on the facilities of end-users. GES affords Geodesco closer control over the sales and installation of the systems.

Protections provided to an equipment buyer in a normal leveraged lease by a third party lender, and clearly defined responsibilities of the lessee, were combined and muddled in the Solargistics–Geodesco program. There was no established lending institution that provided outside financing, nor were any of the companies involved in the investment program publicly held or recognized as established organizations with experience in operating a business. Small companies with limited resources, whose few shares are owned solely by one or two individuals and operated jointly by a narrow group of promoters, are not capable of providing the protections to an investor that are expected in an approved leveraged lease vehicle.

Plaintiffs argue that although Solargistics and Geodesco were mutually dependent, Geodesco was a separate entity, having shareholders, officers, and directors different than those of Solargistics. This argument disregards the functions provided by Drobny and Carpenter, by the pervasive mutuality provided through the management committee,

and by the interchange where officers and directors of Solargistics worked for Geodesco, and officers and directors of Geodesco worked for Solargistics. Any recognition of separate and distinct corporate identities would require the actual facts of Solargistics–Geodesco's operations to be ignored. Blind acceptance of plaintiffs' argument would give legitimacy to misuse of corporate powers breathed by one of the promoters into a corporate shell that had been held on the shelf for an attorney's client.

■ Adjudication of income tax claims long has recognized application of the doctrine of substance over form. The simple expedient of drawing up papers does not control for tax purposes when objective economic realities are to the contrary. *Commissioner v. Tower,* 327 U.S. 280, 291, 66 S.Ct. 532, 538, 90 L.Ed. 670 (1946). In the field of taxation, the concern is with substance and realities, formalities are not rigidly controlling. *Helvering v. Lazarus & Co.,* 308 U.S. 252, 255, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939).

Defendant does not contest plaintiffs' argument that Solargistics could have applied for, and received, a private letter ruling under Rev.Proc. 75–21 that would have recognized the transactions as leveraged leases. Defendant contends, however, that such recognition would not provide a "safe harbor" for the program because, although the plaintiffs owned the uninstalled components they bought, the evidence shows the purchase was for tax benefits, not for promised rent payments.

Absence of a clear third party in the transaction raises the question of whether the equipment buyer merely provides financing, while the seller in effect sells tax benefits, as in a sale-leaseback transaction. *See Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978); *Sacks v. Commissioner,* 64 T.C.M. (CCH) 1003, 1992 WL 252948 (1992). Plaintiffs argue that the Solargistics–Geodesco program is comparable to the solar energy transactions lever-

aged lease programs considered by the Tax Court in *Cooper v. Commissioner*, 88 T.C. 84, 1987 WL 49262 (1987), and *Wood v. Commissioner*, 61 T.C.M. (CCH) 2571, 1991 WL 76340 (1991). These cases, however, involved transactions that were considerably different from the Solargistics–Geodesco operations. Plaintiffs recognized these differences: in *Cooper*, the investors purchased equipment directly from the manufacturer, in the Solargistics program, the equipment was purchased from the manufacturers by Solargistics and then sold to the investors; unlike the transactions in *Wood*, which involved only a single manufacturer, Solargistics purchased equipment directly from various manufacturers; unlike the *Cooper* program, Solargistics–Geodesco did not require the investors to enter accounting arrangements, nor did it require a management agreement, as in the *Wood* program. Additional structural differences from the *Cooper* and *Wood* programs, according to plaintiffs, were: the investor in the Solargistics–Geodesco program purchased a complete system ready to install, the cost of which was paid by Solargistics; in *Wood*, the purchase agreement did not provide for installation, which was the responsibility of the lease company.

The crux of plaintiffs' argument that the Solargistics–Geodesco program was a multiple party transaction is that the leasing entity at all times purportedly had an existence separate and distinct from that of the selling entity. To support the distinct entity concept, plaintiffs rely on the separate stock ownership of Solargistics and Geodesco, the absence of interlocking directorates, and the assertedly separate conduct of each company's respective businesses. These arguments are without merit. Plaintiffs' transactions, while not a true sale-leaseback, involved only two parties.

■ The issue thus becomes, whether plaintiffs' solar energy investments, for income tax purposes, were a sham. It is well settled that taxpayers are free to structure their transactions so as to decrease or eliminate their taxes by any means permitted by law. *Gregory v. Helvering*, 293 U.S. 465, 55

S.Ct. 266, 79 L.Ed. 596 (1935). Tax benefits, however, will not be allowed if the transaction is illusory. A transaction must be given its effect in accord with what actually occurred. *Frank Lyon Co.*, 435 U.S. at 576, 98 S.Ct. at 1300.

■ "To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir.1985). "[C]ourts should examine, carefully and warily, attempts to use the tax system to obtain a benefit or advantage where the only possibility of any real benefit or advantage comes through the tax mechanism itself...." *Brown v. United States*, 426 F.2d 355, 356 (Ct.Cl.1970).

**Profit Motive**

Defendant contends plaintiffs are not eligible for deductions in the year of purchase because they lacked a profit motive. Section 183(a) of the IRC * limits deductions attributable to an activity "not engaged in for profit." Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under" IRC § 162 (ordinary and necessary expenses incurred in carrying on any trade or business), or under paragraph (1) or (2) of IRC § 212 (expenses for (1) the production and collection of income; and (2) management of property held for the production of income). Where taxpayers engage in an activity without the requisite profit motive, deductions are available only to the extent that the gross income derived from such activity for the taxable year exceeds deductions that are allowable despite a lack of profit motive, e.g. deductions allowable under the IRC other than IRC §§ 162 and 212. *See* IRC § 183(b).

Taxpayers must show that profit was their primary motive if they claim to be engaged

---

* All references are to Internal Revenue Code of 1954, as amended to the relevant years.

in a trade or business. "We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Commissioner v. Groetzinger*, 480 U.S. 23, 35, 107 S.Ct. 980, 987, 94 L.Ed.2d 25 (1987).

In this case, unless the investments were engaged in for profit, plaintiffs are entitled to no deductions. To prove that a profit motive existed, plaintiffs must show that the transaction was "entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir.1963).

Treas.Reg. § 1.183–2(a) provides: "[t]he determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case." Treas.Reg. § 1.183–2(b) provides a non-exhaustive list of nine factors that "should normally be taken into account" to determine if a taxpayer had a profit motive. The factors are the following: (1) the manner in which the taxpayer carries on the activity, particularly with regard to whether the activities are carried out in a business-like manner or similar to other profitable endeavors; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) an expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer, in that it shows the motive of the taxpayer and his/her personal need for profits; (9) elements of personal pleasure or recreation, which may indicate a non-profit motive.

These factors are criteria that apply to determination of an investor's profit directed motivation. The motivation of the principal officers that promoted the Solargistics–Geodesco investment program clearly was profit oriented. The Regulation's criteria, however, is not a test of the promoters' motives, and analysis of their operations per se is not transferrable to the plaintiffs.

█ Application of the Treas.Reg. § 1.183–2(b) factors to the plaintiffs in these consolidated cases shows:

1. *Manner in which the taxpayer carries on the activity.* There is no evidence that any plaintiff kept records of their equipment purchase leasing activities, or the ultimate location of their solar equipment after it was purchased. Plaintiffs entrusted the leasing business to Solargistics and Geodesco. Passive investment and delegation of business responsibility to others do not constitute a trade or business. *Smith v. Commissioner*, 91 T.C. 733, 764, 1988 WL 100255 (1988), *aff'd sub nom. Karr v. Commissioner*, 924 F.2d 1018 (11th Cir.1991), *cert. denied*, 502 U.S. 1082, 112 S.Ct. 992, 117 L.Ed.2d 153 (1992).

2. *The expertise of the taxpayer or his advisors.* There is no indication that plaintiffs undertook independent studies or consulted with experts prior to investing. Plaintiffs relied upon the expertise of the principals, Solargistics' brochures and transaction summaries. With one exception (Drobny) all of the plaintiffs relied upon the principals of the involved companies to conduct day to day operations. Reliance on principals, whose primary areas of experience involved accounting, investment and tax law, and the reliance on the promotional literature shows a concern for tax benefits, not profits.

3. *The time and effort expended by the taxpayer in carrying on the activity.* For the most part, the leasing activities were not personally carried out by the investors. The principals of Solargistics and Geodesco were responsible under the program for such activities. In practice, once the transaction documents were signed, the plaintiffs' tasks were completed. There is no evidence that the plaintiffs themselves, other than Drobny, devoted any time to finding end users for their equipment.

4. *Expectation that assets used in the activity may appreciate in value.* The plaintiffs sold their lessees an option to purchase the equipment at the end of the lease term. Even if the equipment did appreciate, the plaintiffs could not profit from the appreciation.

5. *The success of the taxpayer in carrying on other similar or dissimilar activities.* Plaintiffs did not prove that any plaintiffs had experience with other equipment leasing activities.

6. *The taxpayer's history of income or losses with respect to the activity.*

and 7. *The amount of occasional profits, if any, which are earned.* In none of the program years before the court did the plaintiffs receive the rental payments owed to them by the leasing companies. Despite the knowledge that profits had not actually been forthcoming during the previous years' programs, some plaintiffs continued to purchase the equipment. This indicates that their motives were other than profit-oriented.

8. *The financial status of the taxpayer.* The purpose of this inquiry is to determine the taxpayer's need for income, as an indication of its desire for profits. Investors in the 1983 and 1984 programs were required to warrant that they had a net worth of at least $100,000. While $100,000 is not such a substantial amount as to limit the program to those who do not need additional income, it does suggest that involvement in the program was not intended to be an investor's primary profit-making endeavor.

9. *Elements of personal pleasure or recreation.* Many of the principals, and some of the plaintiffs, professed a commitment to development of alternative sources of energy. There is no indication, however, that any had such commitment that it amounted to "personal pleasure."

There are additional facts that require the conclusion that plaintiffs lacked a true profit motive and that the transactions were entered into to obtain tax benefits. Despite the leasing companies' failure to pay rent during all three years of the program, none of the equipment owners sought any of the remedies provided for in the Equipment Rental Agreement. Upon termination of the program, none of the plaintiffs attempted to physically retrieve their property. In summary, an application of the factors set out in Treas.Reg. § 1.183–2(b), particularly with regard to the historical absence of profits, demonstrates plaintiffs' primary motive was other than for profit.

Plaintiffs had no profit motive and can claim no depreciation or other "trade or business" deductions in the year of purchase. Under these circumstances, plaintiffs can claim no tax credits for placing property in service in a trade or business, because they had no "trade or business" within the meaning of the Code. Plaintiffs argue that the solar energy equipment was property eligible for tax credits as well as for depreciation deductions. IRC § 48 property, however, includes only property "with respect to which depreciation ... is allowable" under § 167(a) (applied to "recovery property" by § 168(a)). IRC § 48(a)(3)(C). IRC § 167(a) allows depreciation only for exhaustion "(1) of property used in the trade or business, or (2) of property held for the production of income." The taxpayers' right to both depreciation deductions under § 167(a) and investment tax credits under § 48(a)(1) is contingent upon showing that their activities constituted either a trade or business or were undertaken and carried on for the production of income. *Rose v. Commissioner,* 868 F.2d 851, 853 (6th Cir.1989).

**Economic Substance**

Generally, transactions that have no economic significance other than anticipated tax benefits are considered illusory and tax benefits are denied. *See Falsetti v. Commissioner,* 85 T.C. 332, 1985 WL 15385 (1985); *Brown v. Commissioner,* 85 T.C. 968, 1985 WL 15423 (1985). A transaction lacks economic substance if no "reasonable possibility of profit from the transaction existed apart from tax benefits." *Rice's Toyota World, Inc.,* 752 F.2d at 94.

■ The determination of whether a transaction has economic substance is essentially a two part analysis: (1) whether the substance of the transaction is reflected in its form, and (2) whether the transaction had a reasonable objective possibility of providing a profit aside from tax benefits.

Much of the trial record and posttrial briefing is concerned with examination of the first part of the analysis—substance as reflected in form. To support their contentions that the Solargistics–Geodesco program had economic substance, plaintiffs emphasize two authorities. Plaintiffs rely upon the analysis in *Cooper*, 88 T.C. at 104, of the passage of the burdens and benefits of ownership to a putative purchaser. This analysis involved determination of a bona fide sale by application of the eight factors [1] enunciated in *Grodt v. McKay Realty Inc. v. Commissioner*, 77 T.C. 1221, 1981 WL 11305 (1981). Plaintiffs also rely on the argument that the program allegedly complied with Rev.Proc. 75–21, which thus provided a safe harbor. These arguments, even if in accord with the facts, go only to the "substance as reflected in form" part of the analysis. It is not necessary to examine in detail the various contentions of the parties on those matters because plaintiffs clearly fail the second part of the economic substance analysis—whether a reasonable possibility of making a profit existed.

Even if everything were to go according to plan, the 1982 program only projected a net positive cash flow of $1,400 over 10 years. The 1983 and 1984 programs both projected a net profit cash flow of $3,000. Furthermore, at the time the 1982, 1983, and 1984 investors purchased their units, which was generally at the end of each year, information was available to the principals, in the role of agents to the purchasers, regarding the success of previous leasing activities in the solar energy market. In the 1982 program, the brochure indicated that as of September 1982, many systems remained unplaced from the previous year's program, and additionally, that there was no assurance that Geodesco would be able to meet its obligations to the investors. Similarly, during 1983 and 1984, the principals were aware, and the investors specifically were informed, that many systems remained unplaced and that Geodesco had defaulted on its rental payments. The information most pertinent to their investment decisions, the program brochures, indicated a lack of profit for investors. With regard to any objective reasonability of profit, the transactions were without economic substance.

■ "The law is well settled that tax deductions and credits are a matter of legislative grace and the burden of showing clearly the right to the claimed credits is on the taxpayer." *Segel v. Commissioner*, 89 T.C. 816, 842, 1987 WL 49800 (1987) (citing *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943)). Plaintiffs delegated the majority of the business activities to the principals of the involved companies. These principals primarily were concerned and experienced with tax and accounting matters, rather than the operation of a leveraged leasing business. It was clear from the start that profits were not actually being made, and that profits were not the primary concern of those involved. Plaintiffs failed to prove the existence of a profit motive on their part. With regard to the economic substance of the transaction, the formalities of the sale and lease likely could be sufficient under the *Cooper* analysis. At the time the transaction was entered into, however, an objectively reasonable possibility of making a profit did not exist, based on information available to the principals and to the plaintiffs. Therefore, the transaction lacked economic substance. For these reasons, the Solargistics–Geodesco program was a "sham."

---

1. (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.

*Grodt & McKay Realty Inc.*, 77 T.C. at 1237–38, 1981 WL 11305 (citations omitted).

## APPENDIX A

| Plaintiff | Year | Units |
|---|---|---|
| Allen, Terry and Rita | 1982 | 3 |
| | 1983 | 2 |
| Ashkenasi, Shmuel and Mihaela | 1982 | 1 |
| | 1983 | 1 |
| Aston, James and Ann | 1984 | 1 |
| Barg, Mark and Michaelene | 1983 | 3 |
| Boho, Dan and Sheri | 1984 | 1 |
| Bond, Steven and Cynthia | 1983 | 1 |
| Carone, Robert | 1982 | 1 |
| | 1983 | 1 |
| | 1984 | 1 |
| Chai, Stanley and Sylvia | 1982 | 2 |
| Chestnut, William and Mary | 1984 | 3 |
| Cless, Gerhard and Ruth | 1981 | 4 |
| (KC Partnership: G. Cless 50%, E. Kaplan 50%) | 1982 | 8 |
| Cohodes, Barry and Randi | 1982 | 1 |
| | 1983 | 1 |
| Dachman, Carey and Gail | 1983 | 1 |
| Diamond, Louis and Marlene | 1983 | 1 |
| Doyle, Joan and Estate of Robert | 1981 | 1 |
| | 1982 | 1 |
| Drobny, Sheldon and Anita | 1981 | 5 |
| | 1982 | 6 |
| Dumit, Thomas and Barbara | 1983 | 1 |
| Efferson, Narvin and Theresa | 1982 | 1 |
| Fitzgerald, John and Patricia | 1983 | 1 |
| Frishman, Alvin and Shirley | 1981 | 2 |
| | 1982 | 1 |
| | 1983 | 1 |
| Gardner, Edward and Ellen | 1984 | 1 |

| Plaintiff | Year | Units |
|---|---|---|
| Garris, Estate of Arnold | 1982 | 2 |
| Garris, Arnold and Joseph. | 1981 | 1 |
| (A & J Investments: Arnold 67%, Joseph 33%) | 1982 | 1 |
| Garris, Joseph and Emma | 1981 | 1 |
| (See A & J Investments) | | |
| Geiger, Melvin and Marjorie | 1983 | 1 |
| George, Norman and Carolyn | 1983 | 2 |
| | 1984 | 1 |
| Gierlach, Richard | 1984 | 1 |
| Glustoff, Dale and Arlene | 1982 | 1 |
| Golan, Joseph and Hana | 1981 | 3 |
| | 1982 | 1 |
| | 1983 | 2 |
| Gold, Arthur and Ellyn | 1981 | 1 |
| | 1982 | 2 |
| | 1983 | 2 |
| Siego & Co. | 1981 | .75 |
| (A. Gold 75%, H. Seigle 25%) | 1982 | .75 |
| | 1984 | .75 |
| Gore, Richard and Estate of Camille | 1981 | 2 |
| | 1982 | 2 |
| Harms, James | 1982 | 1 |
| Hartman, Michael and Debra | 1981 | 1 |
| | 1982 | 2 |
| | 1983 | 1 |
| Hason, Ronald and Mary | 1981 | 1 |
| | 1982 | 1 |
| Henoch, Michael and Louise | 1982 | 1 |
| | 1983 | 1 |
| Henry, Donald and Diane | 1983 | 1 |
| Hogenmiller, Rudolph | 1982 | 1 |

| Plaintiff | Year | Units |
|---|---|---|
| Johnson, Deborah L. | 1982 | 1 |
| Kaplan, Edward and Carol | 1981 | 4 |
| (KC Partnership: G. Cless 50%, E. Kaplan 50%) | 1982 | 8 |
| Katlin, Frank and Fay | 1981 | 3 |
| | 1982 | 2 |
| Katlin, Jory and Jill | 1982 | 2 |
| Kolbe, Michael and Margaret | 1983 | 1 |
| Krone, Ronald and Ann | 1982 | 1 |
| | 1983 | 2 |
| Lane, Lee and Susan | 1982 | 1 |
| | 1983 | 1 |
| Linderman, Stuart and Andrea | 1982 | 3 |
| | 1983 | 1 |
| McKee, Mary and J. Cooper | 1984 | 3 |
| Macaluso, Sam and Barbara | 1982 | 1 |
| Meroni, John and Barbara | 1981 | 4 |
| | 1982 | 4 |
| Miscimarra, Anthony and Lauren | 1982 | 1 |
| | 1983 | 1 |
| | 1984 | 1 |
| Morys, Joseph and Estate of Armella | 1982 | 1 |
| Myers, Phillip and Lynnetta | 1982 | 1 |
| | 1983 | 1 |
| Olshansky, Harold and Sheila | 1981 | 3 |
| | 1982 | 2 |
| Olshansky, Melvin and Roberta | 1982 | 2 |
| Payne, Frank and Mary | 1981 | 1 |
| | 1982 | 2 |

| Plaintiff | Year | Units |
|---|---|---|
| Peters, Gordon | 1981 | 2 |
| | 1982 | 2 |
| | 1983 | 2 |
| Phee, Patrick and Kathleen | 1983 | 1 |
| | 1984 | 2 |
| Polivka, Kenneth and Camille | 1982 | 1 |
| | 1983 | 1 |
| Rocco, Estates of Thomas and Marie | 1984 | 1 |
| Rovinsky, Erven and Shirley | 1983 | 3 |
| Rundell, Stephen and Robin | 1981 | 1 |
| | 1982 | 1 |
| Russell, Kim (Howse) | 1983 | 1 |
| Sabransky, Jerry and Martha | 1982 | 1 |
| Sanders, David | 1982 | 1 |
| Schwartz, Neena | 1981 | 1 |
| | 1983 | 1 |
| Sherman, Robert and Sheila | 1983 | 1 |
| Silverman, Irving and Judith | 1982 | 3 |
| Simons, Howard L. | 1981 | 4 |
| | 1982 | 4 |
| St. John, Daniel and Donna | 1983 | 1 |
| Stevenson, Ronald and Susan | 1983 | 1 |
| Swislow, Sidney and Ruth | 1982 | 3 |
| Swislow, Julius and Mary | 1982 | 2 |
| Teague, Henry and Ruby | 1982 | 1 |
| Trombello, Michael and Janice | 1982 | 6 |
| | 1983 | 1 |
| Turrella, Frank | 1983 | 1 |

| Plaintiff | Year | Units |
|-----------|------|-------|
| Valerio, Frank and Annette | 1982 | 5 |
| Vartabedian, Gary and Mary | 1983 | 1 |
| | 1984 | 1 |
| Walker, William and Karen | 1982 | 1 |
| | 1983 | 1 |
| Wallace, Floyd and Susan | 1984 | 1 |
| Walters, David and Mary | 1982 | 1 |
| | 1983 | 1 |
| Weber, Frederick and Lynne | 1983 | 1 |
| Wolf, A. Alvin and Estate of Shirley | 1982 | 1 |
| Wolf, Ronald and Linda | 1983 | 1 |
| Woolf, David and Roslyn | 1982 | 1 |
| Zoghlin, Gilbert and Carolyn | 1982 | 3 |
| Zoldan, Jack and Sharon | 1981 | 1 |
| | 1982 | 1 |
| | 1983 | 1 |

---

## APPENDIX B

## FINDINGS OF FACT

1. Plaintiffs are individuals, each of whom purchased equipment from Solargistics Corporation (Solargistics) either personally, or, in three instances as partners in general partnerships, during the years 1982 through 1984. Plaintiffs are knowledgeable in financial matters, many possessed investment portfolios, and all are sophisticated investors. Plaintiffs as a group include Certified Public Accountants (CPAs), securities broker/dealers, securities representatives, insurance brokers, and other professionals.

2. The investment program was controlled and operated by the principal officers of Solargistics and Geodesco, Inc. (Geodesco).

3. Solargistics was an Illinois corporation engaged in the trade or business of selling solar energy heating equipment. The equipment sold by Solargistics, from 1981 through 1984, was solar energy property within the meaning of 26 U.S.C. § 48(*l*)(4)(B).

4. The original incorporator of Solargistics was Jay Gale (Gale), a businessman, working primarily in mergers and acquisitions. He is Randall S. Goulding's uncle. Randall S. Goulding (Goulding), a CPA and a licensed attorney, was a special agent and revenue agent with the Internal Revenue Service (IRS) from 1971 to 1978. Solargistics was organized by Goulding on November 5, 1981. Goulding and Reuben Rosenberg (Rosenberg) each owned 50% of the shares of Solargistics, and acted as officers and its sole directors. Gerald Goldberg (Goldberg), the only other officer of Solargistics, became vice president in January 1983.

5. Prior to organizing Solargistics, Goulding was familiar with the tax benefits attributable to leveraged leases and to investment in solar energy equipment, including solar heating equipment. He had authored a study regarding such benefits and had clients involved in marketing and manufacturing such equipment.

6. Prior to organizing Solargistics, Rosenberg was a CPA and a licensed securities dealer involved in estate and benefits planning, who had worked in government service in both the IRS and the Federal Energy Administration.

7. In addition to Goulding and Rosenberg, Sheldon Drobny (Drobny) was involved in organizing and structuring Solargistics' business. Drobny was a Certified Public Accountant having extensive experience in venture capital, business organization, tax and accounting, and in leveraged leasing.

8. Drobny from 1967 to 1971 was an employee of the IRS, with service in the audit and training divisions. In 1971, Drobny formed a CPA firm with Louis Adler (A & D) and was a partner in that firm from 1981 to 1984. Drobny devoted 20 hours per week in 1981 to Geodesco and Solargistics, 5–15 hours per week during 1982, and 15–20 hours per week during 1983. Drobny informally resigned in Spring 1983. Drobny never received any salary or commission. A & D did receive compensation for its accounting services during 1981–82.

9. Goldberg had a Bachelors degree in Commerce/Accounting, an M.B.A. in Finance, and was a CPA. Goldberg was first introduced to Solargistics by Rosenberg, and started as an independent contractor in 1982.

10. Geodesco· was an Illinois corporation engaged in the trade or business of selling solar energy heating equipment, leasing such equipment from owners, locating end users for such equipment, and installing and maintaining such equipment. Although organized by Goulding during 1980 as a shelf entity for a client, Geodesco was first utilized by Goulding during 1981.

11. In January 1982, Gerald Habinak (Habinak), Drobny, and A & D became Geodesco's shareholders, officers, and directors. Habinak brought to the operation business acumen, business experience, and ability to deal with leasing dealers and distributors. He had some knowledge of the solar industry. From January 1982, and until June 1984, Habinak and A & D remained the sole shareholders, and Habinak and Drobny remained the sole directors of Geodesco.

12. In 1982, William Speare (Speare) became vice president of Geodesco, and in 1983 he became its president. Speare had a Bachelor's degree in Fine Arts with a major in architecture and was a master carpenter. Speare had started his own solar company, Advanced Solar Design, prior to working for Geodesco. Speare worked primarily full-time for Geodesco.

13. In 1984, Eldeen Carpenter (Carpenter) became the sole shareholder and director of Geodesco, and an officer; and in December 1985, upon Speare's resignation, Carpenter also became the sole officer of Geodesco. Carpenter had a Bachelor's degree in Medical Technology, a Master's degree in Social Work, and was a licensed attorney. Carpenter worked for Goulding's law firm from 1982 through 1985.

14. Prior to organizing Solargistics, Goulding, Rosenberg, Drobny, and others on their behalf, including Gale, conducted market analysis related to the sale, lease, and financing of solar energy heating equipment. During 1981, after much research and analysis, Solargistics formulated a leasing program of its own. The 1981 Solargistics program provided for the equipment purchasers to lease the purchased equipment to Geodesco.

15. Solargistics marketed solar energy heating system leasing programs in each of 1981, 1982, 1983, and 1984, using equipment brochures and transaction summaries prepared by Goulding in 1981 and 1982, and by Leonard Gerstein (Gerstein) in 1983 and 1984. From 1982 to 1984, Geodesco advertised the availability of the equipment for lease using newspaper advertisements, semi-

nars, television, radio, the Yellow Pages, and direct telephone solicitations.

16. In the Spring of 1982, Solargistics had an office in Northbrook, Illinois and one full-time employee, and in the Fall of 1982, Solargistics hired two additional full-time employees, including Goldberg.

17. In the Spring of 1982, Geodesco had an office in Northbrook, and during 1982 and 1983, Geodesco opened four additional offices, two in Colorado and two in Florida. By 1983, Geodesco also had dealerships in approximately ten states. In 1982, Geodesco hired Speare as a part-time employee, and later that year made him a full-time employee. During 1982, Geodesco hired approximately ten additional full-time employees, and during 1983, Geodesco had as many as 30 salespersons and independent contractors in Florida alone.

18. The Solargistics program was designed as a leveraged leasing program: (a) The investor purchased solar energy equipment through Solargistics acting as the manufacturer or manufacturer's representative; (b) Solargistics provided financing in the form of deferred payments; (c) With the purchase of a unit of equipment from Solargistics, the investors executed a Purchase Agreement provided by Solargistics; (d) Each investor agreed to a prearranged lease and rental agreement with Geodesco or a Geodesco company, which was obligated to place the equipment with end users, and remained liable for rental payments to the investor. In 1982 and 1984, all of the investor-owners leased this equipment to Geodesco. In 1983, three alternate leasing companies were potential lessees, Solarquest, Inc., Sun–Ergize Corp., and Geodesco Energy Services, Inc. (GES).

19. During the 1982–84 programs, Solargistics charged $20,000 per unit of equipment to investors, which included two to five solar systems. A $5,000 down payment was required, with the remaining $15,000 being deferred payments. The purchase price was received solely by Solargistics, not Geodesco.

20. The leasing program was structured such that Solargistics would receive income from the deferred portion of the sales price of the equipment. Geodesco would receive income from placement fees to be paid by Solargistics under a Purchase, Installation and Maintenance Agreement. Solargistics' profit was to come from payments by the investors of the $15,000 financed in the equipment purchase. These payments were to be made by Geodesco, on behalf of the purchasers, based on the rents it collected on the leased equipment. Solargistics' profit was totally dependent on successful leasing and rental payments by Geodesco.

21. Geodesco's profit was to come from rent paid by end users (homeowners), and from a fee paid by Solargistics for placement of the equipment. Under its Purchase, Installation, and Maintenance agreement with Solargistics, Geodesco would not begin to earn installation fees for 1982 equipment until it had installed 50 percent of the units. After installing 50 percent of the units, Geodesco would receive approximately 1.5 percent of the installation fee owed. In 1981, Solargistics sold 304 units of solar equipment to investors. As of February 26, 1982, only 90 systems actually had been placed on end users' homes.

22. Solargistics and Geodesco were dependent upon each other in order to profit from the Solargistics programs. Solargistics was dependent upon successful leasing of the equipment by Geodesco to end users in order for the investor-owners to pay the deferred portion of the sales price.

23. Geodesco was dependent upon Solargistics for a source of equipment which Geodesco could in turn lease to end users, and for working capital. Throughout 1982, 1983, and 1984, Solargistics loaned funds to Geodesco.

24. As a result of their interdependence, the officers and directors of Solargistics and Geodesco were required to, and did in fact, work closely together. Beginning in 1982,

and until problems arose between the principals and Habinak during 1983, a Management Committee consisting of Goulding, Rosenberg, Habinak, Drobny, and Goldberg, met at least weekly. During 1984, the Management Committee, without Habinak and Drobny, continued to meet weekly with Carpenter participating. As a result of their interdependence, officers and directors of Solargistics often worked for Geodesco, and officers and directors of Geodesco often worked for Solargistics.

25. Solargistics' 1982 brochure described the tax benefits from the program as 2.8:1 for 1982, up to 5:1 cumulative through 1986. Solargistics' 1983 brochure described the tax benefits from the program as 2.5:1 for 1983, and 4:1 in 1984. Solargistics' 1984 brochure described the tax benefits from the program as 2.5:1 for 1984, and 4:1 in 1985.

26. Solargistics' programs provided that the deferred portion of the equipment sales price was either recourse or nonrecourse, at the option of the purchaser.

27. The 1982, 1983, and 1984 programs each provided that upon any event of default, the purchaser had the right to terminate the lease and declare due, sue for, and receive from the lessee (1) all rents due and owing; (2) all rents that might later become payable under the lease; and (3) $1,000 as liquidated damages. In all three programs, the lease contracts included among events of default, a failure to pay rent for a period of 30 days after the rent fell due.

28. Solargistics' equipment sales took place primarily in the Fall of each year. Sales agents who sold Solargistics' equipment units received a commission of 10 percent of the cash sales price from Solargistics.

29. During 1981, Solargistics and Geodesco developed a 10–year business plan, which anticipated that Solargistics would sell and Geodesco would lease and find end users for 10,000 solar energy heating systems during that period, and that everyone involved would profit. Over the 10 years of the business plan, after both direct and indirect costs, Solargistics and Geodesco believed that Solargistics would earn $7 million before general and administrative expenses, which expenses would be approximately $100,000 to $200,000 per year. Over the 10 years of the business plan, after direct costs, but before operating expenses, Solargistics and Geodesco believed that Geodesco would earn $21 million.

30. From 1981 through the Fall of 1983, Solargistics and Geodesco believed that they could be more profitable and raise greater capital by making a public offering of Solargistics stock. They retained a securities law firm and requested it to prepare an initial public offering. The public offering was abandoned in the Fall of 1983 after problems arose between the principals of Solargistics and Geodesco, and after the IRS commenced its audit of Solargistics.

31. During 1983 problems arose between the principals of Solargistics and Geodesco. Habinak created problems with suppliers and leasing personnel which the remaining principals decided had to be resolved. As a consequence of the Habinak matter, during 1983, Geodesco had to close certain leasing offices. The problems with Habinak were resolved in June 1984, when Habinak tendered return of his stock in Geodesco.

32. By the end of 1983, only 10 percent of the 1982 units had been placed by Geodesco. By the end of 1984, only 25 percent of the 1982 units had been placed by Geodesco. Geodesco never received payments for installation of the 1982 program. To cover its operating costs, Solargistics lent money to Geodesco. Geodesco was to repay these loans with interest, and to secure the obligation by assigning its receivables to Solargistics.

33. Geodesco never received payments under the equipment rental agreements. Geodesco defaulted on the 1983 and 1984

programs when it failed to pay rent for a period of 30 days after it was due. Investors were specifically notified of this default. No plaintiff ever pursued any of the remedies for default allowed by the lease contracts. Although, on December 1, 1987, Geodesco offered the investors the opportunity to retrieve their equipment and carry on their leasing business independently, all the plaintiffs chose to have their equipment liquidated, and Geodesco did liquidate all unplaced equipment that had not been lost.

34. Solargistics waived its lien and forgave the debt of $15,000 per unit that investors had incurred upon purchase of the equipment. After liquidation, Geodesco allowed plaintiffs to choose among the following ways of receiving the proceeds for each $20,000 unit: (1) membership in an organization that provided travel services; (2) discount credits from a mail order company; or (3) $80 cash. Geodesco mailed out $80 to equipment owners, but some had relocated without leaving a forwarding address and were not capable of being located by Geodesco. The sums not able to be paid out were used by Geodesco to pay creditors.

35. Solargistics sold its equipment and the investors purchased the equipment at retail. Plaintiffs' solar energy equipment was permanently affixed to the homeowners' properties. This equipment could be removed with one to two days of work. Not all components could be removed, particularly the piping, and removal of the roof panels would leave holes in the roof that could only be repaired upon re-roofing. The useful life of the major components of the systems was from 20 to 30 years.

36. Before installation, Solargistics could not tell whether an investor's unit was comprised of five single panel systems or three two panel systems. Before 1985, Solargistics and the leasing companies had established no formal inventory control system to track equipment stored with manufacturers or sellers.

37. Solargistics had lost equipment belonging to investors through both bankruptcy of manufacturers and theft. The lost equipment was not recovered by Solargistics. The leasing companies were required to notify an investor if equipment was lost, stolen, or damaged, and, for the 1982–83 programs, to insure the equipment for $20,000 per unit. There is no evidence of either an insurance policy taken out by Geodesco, or of any claims made.

38. In 1981, Solargistics purchased substantially all of its equipment from Solar Development, Inc. (SDI). During 1981, Solargistics sold approximately 304 units of equipment to approximately 180 purchasers for $20,000 per unit of equipment. All or substantially all of such equipment was subsequently installed on homes and residences in the Pacific Northwestern part of the United States by Geodesco through a dealership network that had been established by SDI.

39. Solargistics' 1982 brochure offered the sale for $20,000 of equipment that "could constitute one or more different types of wind or solar energy systems. More specifically, it will be comprised of one large multi-paneled system or two or more, up to as many as six smaller hot-water heating systems." During 1982, there were sales only of water heating systems, primarily five-paneled.

40. The 1982 Solargistics program was designed as a leveraged leasing program, with the equipment purchaser buying equipment from Solargistics, and with Solargistics providing financing in the form of deferred payments. The equipment sold by Solargistics was subject to a preexisting lease with Geodesco, with the lease payments intended to be applied to the deferred purchase price, and with only minimal excess rentals being paid to the purchaser until after the purchase price was fully paid.

41. In 1982, the Solargistics program required the purchaser to pay the following sums:

| | | |
|---|---:|---:|
| Purchase Price | $20,000 | |
| Down Payment | 5,000 | |
| Deferred Payments | $15,000 | |
| Payable over 10 years with 9% interest | | $2,337.30 per year |
| Maintenance Fee | $ 2,600 | |
| Down Payment | 600 | |
| Balance Paid by Assign. of Option Premium | $ 2,000 | |
| Total Initial Payment | $ 5,600 | |

42. The financing was offered to purchasers with or without recourse. The equipment purchaser was required to pay a $2,600 first year maintenance fee per unit. Purchasers were only required to pay $600 of this amount down if they elected to grant the end users of the equipment an option to purchase the equipment upon the earlier of 10 years or upon termination of the lease between the equipment purchaser and Geodesco for an aggregate of $3,000. In return for the option, the purchaser was paid an option premium of $2,000, which at the purchaser's election could be applied to offset the first year maintenance fee. The 1982 Solargistics program also provided for Geodesco to pay to the equipment purchaser a fee of $2,500, either upon termination of its lease, or as reimbursement of the cost of removing the purchaser's equipment from any building upon which it had been installed.

43. The 1982 Solargistics brochure projected a positive cash flow of $7,000 per unit purchased, which, after the $5,600 due upon purchase, amounted to $1,400 net positive cash flow over a period of 10 years. The 1982 Solargistics program projected tax benefits of approximately $6,400 per unit of equipment based upon a 50 percent tax bracket.

44. The Purchase Agreement signed by each investor provided that each unit was subject to an Equipment Rental Agreement. The Equipment Rental Agreement provided in Item 24 that this Agreement is freely assignable, and that prior to the earlier of any assignment or

(b) the expiration of the thirty day period,

(i) the Owner is not entitled to use or otherwise enjoy any benefits hereunder,
(ii) the Equipment may not be used by either party hereto or otherwise, and
(iii) no rents shall be payable to the Owner and the Equipment shall not be placed in service.

45. Solargistics assigned its rights under its pre-existing lease to purchasers of units, but reserved for itself the right to receive the first $800 of rent per unit to be paid by the lessee, Geodesco.

46. During 1982, Solargistics sold approximately 473 units of solar equipment to approximately 264 purchasers, for $20,000 per unit.

47. In at least one instance, Geodesco held the equipment out for lease to an end user, Robert L. Ingle, before Solargistics sold it to the investor, Dale Glustoff.

48. Prior to December 31, 1982, Solargistics received from the various manufacturers with whom it had placed orders, written confirmation of the existence and location of the equipment. Prior to the installation of the equipment purchased by Solargistics and assigned to investors in 1982, the equipment was stored in inventory at the manufacturers' factories.

49. Under the 1982 program, the installment payments of $2,337.30 supposed to be made by Geodesco on behalf of the equipment owners to Solargistics, were not made in cash, but only by entries on the books. The $150 payments owed to the equipment owners (after payment of the $2,337.30) were

not made at all by Geodesco. Solargistics and Geodesco entered their 1982 lease agreement on November 1, 1982. All of the 1982 plaintiffs purchased their equipment more than 30 days after Solargistics and Geodesco entered their 1982 lease agreement. Some equipment that was part of the 1982 program was not actually manufactured until 1983. As of March 25, 1983, Geodesco had placed only 33 of the 1,521 systems that Solargistics had sold to its investors in 1982.

50. Solargistics' 1983 brochure offered the sale for $20,000 of equipment that "could constitute two or more different types of wind or solar energy systems. More specifically, it will be comprised of two multi-paneled systems, or three to five, smaller hot-water heating systems." The 1983 Solargistics brochure offered the purchaser the opportunity to lease the equipment to Geodesco in 1983. In the complaints filed in this case and the claims for refund, the plaintiffs stated they were leasing their equipment to Geodesco during 1983.

51. In 1983, the Solargistics program required the purchaser to pay the following sums:

| | | |
|---|---|---|
| Purchase Price | $20,000 | |
| Down Payment | 5,000 | |
| Deferred Payments | $15,000 | |
| Payable with 9% interest | | $2,337.30 per year |
| Maintenance Fee | $ 3,500 | |
| Down Payment | 1,500 | |
| Promissory Note | $ 2,000 | |
| Payable with 17.5% interest | | $ 800 in 1984 |
| Balance Due | | $2,516.25 in 1988 |
| Total Initial Payment | $ 6,500 | |

52. In the 1983 Solargistics program, the first year maintenance fee was increased from $2,600 to $3,500 per unit of equipment. The program provided for the optional financing of a portion of the first year maintenance fee. Additionally, the 1983 program included a right of the lessee to exercise two separate options: (1) an option to extend the lease term; and (2) an option to purchase the equipment for a sum certain. The equipment owner would be required to accept the exercise by the lessee of the option to extend the lease or purchase the equipment if the owner had accepted the option premium. The 1983 program required each investor to warrant that he had a net worth of at least $100,000. The financing was offered to purchasers with or without recourse.

53. In the 1983 promotional literature, Solargistics projected the following positive cash flow for the purchaser of one unit of equipment who leased such equipment to a leasing company under its program:

| | |
|---|---|
| Annual Net Rental Income After Setoff for Promissory Note Payment and Annual Maintenance Charge | $ 152.70 |
| | × 10 |
| | $1,527.00 |
| Estimated Rent for Remaining Option Period | 5,500.00 |
| Option Exercise Price | 3,150.00 |
| Net Option Premium After Setoff for Maintenance Fee Loan | 84.00 |
| Positive Cash Flow | $10,261.00 |

54. In 1983, Solargistics projected that each purchaser would receive net positive cash flow over the initial term of the lease and the option term (a total of 12 years) of approximately $3,000 ($10,261 less $6,500 due in 1983 and less $800 due in 1984), a return of 141% over such period.

55. During 1983, Solargistics sold approximately 233 units of equipment to approximately 178 purchasers, for $20,000 per unit.

56. At the time they purchased their equipment, the investors did not actually know the name of their leasing company. With regard to a leasing company, purchase documents were sometimes submitted in blank, and then a clerk in the Northbrook office would fill in the name of a lessee.

57. During 1983, Habinak worked principally in Colorado while Speare was in Florida running the sales operations. Goldberg worked full time and was vice president of Solargistics. He also assisted with the leasing activities of the program. Problems arose between Habinak and the rest of the Management Committee during 1983. On March 25, 1983, when the promoters were considering a 1983 program, they also considered hiring a consultant to reduce friction between members of the Management Committee. Habinak was accused of embezzling an uncertain sum of money—from $30,000 to $80,000. Habinak threatened to put Geodesco into receivership. At that time, Geodesco had many obligations that it could not meet.

58. Drobny informally resigned from Geodesco in the Spring of 1983, but continued to assist Solargistics and Geodesco as an accountant and tax advisor. Drobny retained his shares in Geodesco until June 1984. Habinak left the program in late 1983, but did not tender back his shares in Geodesco until the middle of 1984. Rosenberg took over Habinak's functions as head of Geodesco.

59. Because of the dispute with Habinak during 1983, Goulding and Rosenberg decided that they would no longer recommend that the equipment that Solargistics sold to equipment purchasers be leased to Geodesco. During 1983, Goulding requested that Carpenter activate the new potential leasing entities, GES and Solarquest, to which the 1983 equipment purchasers would be referred.

60. The articles of incorporation for Solarquest and GES were filed with the Illinois Secretary of State on January 5, 1984. Carpenter obtained the permission of Alan Zech, on whose behalf Ginseng, Inc. (Ginseng) had been incorporated on May 13, 1983, to use Ginseng as a solar energy leasing company. Articles of Amendment were submitted on April 23, 1984, with regard to Ginseng, Inc. to change its name to Sun–Ergize Corp.

61. All of the plaintiffs' leases were assigned to Solarquest, except for Arthur and Ellyn Gold and Ronald and Susan Stevenson, whose leases were assigned to Sun–Ergize (f/k/a Ginseng). The plaintiffs believed they were leasing their equipment to Geodesco. In 1983, Geodesco accepted no offers to lease equipment.

62. Speare believed the 1983 program equipment, which he did not begin leasing to end users until 1984, was being leased through Geodesco. Speare was paid by Geodesco, not by Solarquest, Sun–Ergize, or Ginseng. Prior to installation, the equipment purchased by Solargistics and assigned to equipment purchasers in 1983 was stored in facilities controlled by Speare or at the manufacturers' factories, and when needed for

installation was obtained and installed by Speare.

63. In 1983, Solarquest had no shareholders and no officers. Solarquest had no employees and owed no federal payroll taxes. Solarquest applied for a Federal Employer Identification Number on May 15, 1984, which was assigned on June 5, 1984. The Purchase, Installation, and Maintenance Agreement, under which Solarquest was to earn its fees for installation of the 1983 equipment was not executed. The Purchase, Installation, and Maintenance Agreement, under which Sun–Ergize was to earn its fees for installation of the 1983 equipment was not executed. Other than completion of articles of incorporation, the corporate formalities were not administered with regard to Solarquest and Sun–Ergize during 1983.

During 1983, Solarquest, GES, and Ginseng did not have either officers or shareholders.

64. Carpenter was the sole shareholder of Solarquest on January 10, 1984. In 1986, after Carpenter had become Geodesco's sole shareholder, GES, Solarquest and Sun–Ergize were merged into Geodesco, Inc. Carpenter signed the articles of merger on their behalf.

65. Solargistics' 1984 program was essentially the same as its 1983 program, except for minor modifications to rental income, maintenance fee and financing repayment schedules. The financing program was offered to the purchaser with or without recourse. The 1984 program required each investor to warrant that he had a net worth of at least $100,000.

66. In 1983, the Solargistics program required the purchaser to pay the following sums:

| | | |
|---|---|---|
| Purchase Price | $20,000 | |
| Down Payment | 5,000 | |
| Deferred Payments | $15,000 | |
| Payable with 9% interest | | $2,337.30 per year |
| Maintenance Fee | $ 3,500 | |
| Down Payment | 1,500 | |
| Promissory Note | $ 2,000 | |
| Payable with 17.5% interest | | $ 800 in 1984 |
| Balance Due | | $2,516.25 in 1988 |
| Total Initial Payment | $ 6,500 | |

67. Solargistics' 1984 brochure offered the purchaser the opportunity to lease the equipment to "at least four" lease companies known to Solargistics. The brochure also stated that, in 1984, Geodesco had defaulted in its rental obligations to all owners of solar equipment. The brochure informed potential investors that the three leasing companies, Solarquest, GES, and Sun–Ergize had been near totally unable to lease any of the 1983 equipment. All of the 1984 plaintiffs leased their equipment to Geodesco.

68. Solargistics' 1984 promotional brochure projected the following positive cash flow for the purchaser of one unit of equipment who leased such equipment to Geodesco:

| | |
|---|---|
| Annual Net Rental Income After Setoff for Promissory Note Payment and Annual Maintenance Charge | $ 152.52 |
| | × 10 |
| | $1,525.20 |
| Estimated Rental for Remaining Option Period | 5,700.00 |
| Option Exercise Price | 3,150.00 |
| Net Option Premium After Setoff for Maintenance Fee Loan | 84.00 |
| Positive Cash Flow | $10,459.20 |

---

69. Solargistics' projected positive cash flow of $10,459.20 assumed the option term was exercised (for a total of 12 years). Taking into account the $6,500 down payment and the $800 due in 1985 for the maintenance agreement, this resulted in a net positive cash flow of approximately $3,000.

70. During 1984, Solargistics sold approximately 124 units of equipment to approximately 86 purchasers, for $20,000 per unit.

71. During 1985 Solargistics ceased doing business, and Geodesco ceased its efforts to locate additional end users. Speare resigned from Geodesco and Goldberg resigned from Solargistics both during the fall of 1985. In 1988, Geodesco liquidated all remaining unplaced equipment and distributed the proceeds to the equipment owners.

## CONCLUSION

On the basis of the foregoing, plaintiffs have not established their claims for depreciation deductions, investment tax credits, or energy tax credits. Plaintiffs are not entitled to refunds. The Clerk is directed to dismiss the complaints. Costs to defendant.

/s/ Kenneth R. Harkins
Kenneth R. Harkins,
Senior Judge